Approved for Release 8/11/2015

*EXHIBIT A*



## Office of the Attorney General
### Washington, D.C. 20530

**June 23, 2011**
**LIMITED OFFICIAL USE**

*INITIAL SAM*

MEMORANDUM FOR THOMAS R. KANE
                        ACTING DIRECTOR
                        FEDERAL BUREAU OF PRISONS

FROM:     THE ATTORNEY GENERAL

SUBJECT:  Origination of Special Administrative Measures (SAM)
             Pursuant to 28 C.F.R. § 501.2 for Federal Bureau of Prisons
             Inmate Harold James Nicholson

On March 3, 1997, Harold James Nicholson pleaded guilty in the Eastern District of Virginia to conspiracy to commit espionage, in violation of 18 U.S.C. §§ 794(a) and (c). As part of his guilty plea, Nicholson admitted that between June 1994 and November 16, 1996, he provided the Russian Federation with documents and other information relating to the national defense of the United States, with the intent and reason to believe that the same would be used to the injury of the United States and to the advantage of the Russian Federation. This unauthorized disclosure of classified information resulted in damage to national security operations. Nicholson was sentenced to 23 years and seven months in prison, and until recently had been serving his sentence at the Federal Correctional Institute (FCI Sheridan) in Sheridan, Oregon.

As part of his plea agreement in 1997, Nicholson acknowledged his continuing obligations with respect to secrecy associated with his employment with the Central Intelligence Agency (CIA) and agreed to have "no contact with any foreign government or agents thereof, and ... not seek or accept, personally or through another person or entity, any benefit from such government," including through any member of his family. He also acknowledged that the government reserved its right to impose SAM as a condition of his imprisonment. To date, Nicholson has not been subject to SAM. —

As detailed in the attached request from CES/NSD and the accompanying letter and certification from the Director of the CIA, the FBI's investigation revealed that during the course of his incarceration, Nicholson used his youngest son, Nathaniel Nicholson (Nathan), to continue to provide information the Russian government in exchange for regular cash payments. Nathan visited his father regularly, and they also communicated frequently through telephone and written correspondence. According to the FBI, Nathan met with Russian government representatives — outside the United States at his father's direction. These communications between Nicholson and the Russian government via Nathan took place even as Nicholson's outgoing calls were

Approved for Release 8/11/2015

**SPECIAL ADMINISTRATIVE MEASURES (SAM)**                    Page 2
Pursuant to 28 C.F.R. § 501.2
Inmate - Harold Nicholson

being recorded for CIA review, his outgoing mail was being sent to the CIA for classification review, and the CIA was approving his visitors – procedures that were put in place as part of his plea agreement.

The FBI's investigation further disclosed that between December 2006 and December 2008, Nathan traveled overseas on multiple occasions to meet with Russian officials, returning from those meetings with cash that the Russians gave him in amounts under $10,000, so as to avoid currency reporting requirements. Nicholson was aware of these trips before they occurred, and he provided direction to his son with respect to his (Nathan's) interactions with Russian officials, as well as methods to avoid detection by U.S. law enforcement. He gave Nathan notes to smuggle out of the prison and provide to the Russian officials, as well as instructions with respect to the handling of cash that Nathan received from the Russians. CIA review of the communications between Nicholson and his son reveals numerous coded conversations relating to Nathan's travels in connection with this scheme.

On December 15, 2008, following his return to Oregon from a trip to Cyprus, the FBI interviewed Nathan about his overseas travel. During the course of this interview, Nathan admitted to meeting with Russian officials and to receiving cash from them. In addition, he stated that he gave the Russians notes that he had smuggled out of the prison for his father. Nathan also told the FBI that the Russians had asked him to obtain information relating to the circumstances of Harold Nicholson's 1997 espionage arrest, including details surrounding one of his father's work transfers while he was a still CIA officer; the point at which his father first suspected he was under FBI surveillance; Nicholson's cancelled posting as a CIA officer in a foreign country; and the identifies of those who had interrogated Nicholson following his arrest in 1997. According to the CIA, the answers to these questions could, depending on the level of detail provided, constitute the unauthorized disclosure of classified information and cause serious damage to national security. Both Harold and Nathan Nicholson were indicted in January 2009 on conspiracy and money laundering charges relating to their unreported and illegal agency for the Russian Federation.

On August 29, 2009, Nathan Nicholson entered a plea of guilty to two counts of the indictment: conspiracy to act as an agent of a foreign government without prior notification to the Attorney General, and conspiracy to commit money laundering. He received a sentence of five years' probation as a result of his cooperation and mitigating circumstances, including his father's manipulation of him throughout the entire criminal conspiracy.

When confronted with evidence of his son's illicit activities on his behalf, Nicholson initially refused to cooperate. However, shortly before his trial, on November 8, 2010, Nicholson entered a guilty plea to two counts of the indictment: conspiracy to act as an agent of a foreign

LIMITED OFFICIAL USE

Approved for Release 8/11/2015

**SPECIAL ADMINISTRATIVE MEASURES (SAM)**                                              Page 3
Pursuant to 28 C.F.R. § 501.2
Inmate - Harold Nicholson

government without prior notification to the Attorney General, and conspiracy to commit money laundering.  The court accepted Nicholson's plea, which incorporated the terms of his earlier 1997 plea agreement.  On January 18, 2011, the court sentenced him to an eight-year prison sentence, consecutive to the original 1997 prison sentence.

As noted above, Nicholson's repeated post-conviction communications with Russian officials and his manipulation of his son to engage in the scheme constituted not only new criminal activity, but also a violation of the terms of his original plea agreement, as well as his continuing obligations with respect to secrecy associated with his CIA employment.  Additionally, the FBI's investigation disclosed that Nicholson had sought to use other inmates to deliver messages for him.  Moreover, Nicholson continues to demonstrate a complete lack of remorse: at his sentencing, he apologized to the Russian Federation for any embarrassment his conviction caused that government.  His recalcitrance raises serious national security concerns as to any information relevant to his former employment with the CIA that he may still possess and which he might seek to share with the Russian Federation.  In light of this, and in connection with the attached request for the SAM, the Director of the CIA has certified, pursuant to 28 C.F.R. § 501.2, that the implementation of SAM is reasonably necessary to prevent disclosure of classified information by Nicholson, and that the disclosure of such information would pose a threat to the national security.

*[handwritten: Partial sentence, out of context]*

Based upon information provided to me, including Nicholson's lengthy service as a clandestine agent for the Russian Federation, his recent clandestine intelligence activities on behalf of the Russian government, and his apology at his recent sentencing to that government, I find that there is a danger that Nicholson will disclose classified information, that the unauthorized disclosure of such information would pose a threat to the national security of the United States, and that SAM on Nicholson are reasonably necessary to prevent disclosure of such information.  Therefore, I am requesting that you, pursuant to 28 C.F.R. § 501.2, implement SAM to restrict Nicholson's access to the mail, the media, the telephone, and visitors.  Implementation of the SAM will commence immediately upon notice to the inmate, and the SAM will be in effect for one year from the date of my approval, subject to my further direction.

1.   General Provisions:                         *[handwritten: June 23 2011]*

a.       **Adherence to Usual United States Marshals Service (USMS), Bureau of Prisons (BOP), and Detention Facility (DF) Policy Requirements** - In addition to the below-listed SAM, the inmate must comply with all usual USMS, BOP, and non-BOP DF policies regarding restrictions, activities, privileges, communications, etc.  If there is a conflict between USMS/BOP/DF policies and the SAM, as set forth herein, where the SAM is more restrictive than usual

LIMITED OFFICIAL USE

Approved for Release 8/11/2015

**SPECIAL ADMINISTRATIVE MEASURES (SAM)**
Pursuant to 28 C.F.R. § 501.2                                                    Page 4
Inmate - Harold Nicholson

USMS/BOP/DF policies, then the SAM shall control.  If usual USMS/BOP/DF policies are more restrictive than the SAM, then USMS/BOP/DF policies shall control.

b.   **Interim SAM Modification Authority** - During the term of this directive, the Director, Office of Enforcement Operations (OEO), Criminal Division, may modify the inmate's SAM as long as any SAM modification authorized by OEO:

   i.    Does not create a more restrictive SAM;

   ii.   Is not in conflict with the request of the Section Chief, Counterespionage Section, National Security Division (CES/NSD), Federal Bureau of Investigation (FBI), Central Intelligence Agency (CIA), or USMS/BOP/DF, or applicable regulations; and

   iii.  Is not objected to by the CES/NSD, FBI, CIA, or USMS/BOP/DF.

c.   **Inmate Communications Prohibitions** - The inmate is limited, within USMS/BOP/DF's reasonable efforts and existing confinement conditions, from having contact (including passing or receiving any oral, written or recorded communications) with any other inmate, visitor, attorney, or anyone else, except as outlined and allowed by this document, that could reasonably foreseeably result in the inmate communicating information (sending or receiving) that could circumvent the SAM's intent of significantly limiting the inmate's ability to communicate (send or receive) classified information.

   i.    The USMS/BOP/DF may permit the inmate to communicate with other SAM inmates orally only during certain predesignated times, the place and duration to be set by the USMS/BOP/DF.  The inmate shall not have any physical contact with other inmates during this predesignated time, and all such predesignated sessions will be monitored and/or recorded.  Upon request of the FBI and/or the CIA, a copy of the recordings will be provided by the USMS/BOP/DF to the FBI and/or the CIA to be analyzed for indications that the inmates are attempting to pass classified information.

LIMITED OFFICIAL USE

Approved for Release 8/11/2015

**SPECIAL ADMINISTRATIVE MEASURES (SAM)**
Pursuant to 28 C.F.R. § 501.2                                                      Page 5
Inmate - Harold Nicholson

2.   **Attorney/Client Provisions:**

    a.   **Attorney[1] Affirmation of Receipt of the SAM Restrictions Document - The** inmate's attorney (or counsel) – individually by each if more than one – must sign an affirmation acknowledging receipt of the SAM restrictions document. By signing the affirmation, the attorney acknowledges his/her awareness and understanding of the SAM provisions and his/her agreement to abide by these provisions, particularly those that relate to contact between the inmate and his attorney and the attorney's staff. The signing of the affirmation does not serve as an endorsement of the SAM or the conditions of confinement, and does not serve to attest to any of the factors set forth in the conclusions supporting the SAM. However, in signing the affirmation, the inmate's attorney, and precleared staff, acknowledge the restriction that they will not forward third-party messages to or from the inmate.

        i.   The CES/NSD shall present, or forward, the attorney affirmation of receipt of the SAM restrictions document to the inmate's attorney.

        ii.   After initiation of SAM and prior to the inmate's attorney being permitted to have attorney/client privileged contact with the inmate, the inmate's attorney shall execute a document affirming receipt of the SAM restrictions document and return the original to the CES/NSD.

        iii.   The CES/NSD shall maintain the original of the SAM acknowledgment document and forward a copy of the signed document to OEO in Washington, D.C. and the USMS/BOP/DF.

    b.   **Attorney/Client Privileged Visits -** Attorney/client privileged visits may be contact or non-contact, at the discretion of the USMS/BOP/DF.

    c.   **Attorney May Disseminate Inmate Conversations -** The inmate's attorney may disseminate the contents of the inmate's communication to third parties for the

---

[1] The term "attorney" refers to the inmate's attorney of record, who has been verified and documented by the CES/NSD, and who has received and acknowledged receipt of the SAM restrictions document. As used in this document, "attorney" also refers to more than one attorney where the inmate is represented by two or more attorneys, and the provisions of this document shall be fully applicable to each such attorney in his/her individual capacity.

**LIMITED OFFICIAL USE**

Approved for Release 8/11/2015

**SPECIAL ADMINISTRATIVE MEASURES (SAM)**                                  Page 6
Pursuant to 28 C.F.R. § 501.2
Inmate - Harold Nicholson

sole purpose of providing necessary legal services related to the inmate's post-sentencing proceedings — and not for any other reason — on the understanding that any such dissemination shall be made solely by the inmate's attorney, and not by the attorney's staff.

d.   **Unaccompanied Attorney's Precleared Paralegal(s)[2] May Meet With Client -** The inmate's attorney's precleared paralegal(s) may meet with the inmate without the necessity of the inmate's attorney being present.  An investigator or interpreter/translator may not meet alone with the inmate.  These meetings may be contact or non-contact, at the discretion of the USMS/BOP/DF.

e.   **Simultaneous Multiple Legal Visitors -** The inmate may have multiple legal visitors provided that at least one of the multiple legal visitors consists of the inmate's attorney or precleared paralegal.  These meetings may be contact or non-contact, at the discretion of the USMS/BOP/DF.

f.   **Legally Privileged Telephone Calls -** The following rules refer to all legally privileged telephone calls or communications:

   i.   **Inmate's Attorney's Precleared Staff May Participate in Inmate Telephone Calls -** The inmate's attorney's precleared staff are permitted to communicate directly with the inmate by telephone, provided that the inmate's attorney is physically present and participating in the legal call as well.

   ii.  **Inmate's Initiation of Legally Privileged Telephone Calls -** Inmate-initiated telephone communications with his attorney or precleared staff are to be placed by a USMS/BOP/DF staff member and the telephone handed over

---

[2] "Precleared" when used with regard to an attorney's staff, or "precleared staff member," refers to a co-counsel, paralegal, or an investigator who is actively assisting the inmate's attorney with the inmate's post-sentencing proceedings, who has submitted to a background check by the FBI and CES/NSD, who has successfully been cleared by the FBI and CES/NSD, and who has received a copy of the inmate's SAM and has agreed — as evidenced by his/her signature — to adhere to the SAM restrictions and requirements.  As used in this document, "staff member" also refers to more than one staff member, and the provisions of this document shall be fully applicable to each such staff member in his/her individual capacity.  A "paralegal" will also be governed by any additional DF rules and regulations concerning paralegals.

<u>LIMITED OFFICIAL USE</u>

Approved for Release 8/11/2015

**SPECIAL ADMINISTRATIVE MEASURES (SAM)**                                   Page 7
Pursuant to 28 C.F.R. § 501.2
Inmate - Harold Nicholson

to the inmate only after the USMS/BOP/DF staff member confirms that the person on the other end of the line is the inmate's attorney. This privilege is contingent upon the following additional restrictions:

(1)    The inmate's attorney will not allow any non-precleared person to communicate with the inmate, or to take part in and/or listen to or overhear any communications with the inmate.

(2)    The inmate's attorney must instruct his/her staff that:

    (a)    The inmate's attorney and precleared staff are the only persons allowed to engage in communications with the inmate.

    (b)    The attorney's staff (including the attorney) are not to patch through, forward, transmit, or send the inmate's communications to third parties.

(3)    No telephone call/communication, or portion thereof, except as specifically authorized by this document:

    (a)    Is to be overheard by a third party.[3]

    (b)    Will be patched through, or in any manner forwarded or transmitted to a third party.

    (c)    Shall be divulged in any manner to a third party, except as otherwise provided in Section 2(c) above.

---

[3] For purposes of the SAM, "third party" does not include officials of the USMS/BOP/DF, FBI, CIA, DOJ, or other duly authorized federal authorities when acting in connection with their official duties. This section does not allow monitoring of attorney/client privileged communications.

LIMITED OFFICIAL USE

Approved for Release 8/11/2015

SPECIAL ADMINISTRATIVE MEASURES (SAM)
Pursuant to 28 C.F.R. § 501.2                                      Page 8
Inmate - Harold Nicholson

(d)   Shall be in any manner recorded or preserved.[4]  The inmate's attorney may make written notes of attorney/client privileged communications.

(4)   If USMS/BOP/DF, FBI, CIA, or CES/NSD determines that the inmate has used or is using the opportunity to make a legal call to speak with another inmate or for any other non-legal reason that would circumvent the intent of the SAM, the inmate's ability to contact his attorney by telephone may be suspended or eliminated.

g.   **Documents Provided by Attorney to Inmate** - During a visit, the inmate's attorney may provide the inmate with, or review with the inmate, documents related to his post-sentencing proceedings and/or material prepared by the inmate's attorney related to such proceedings, so long as any of the foregoing documents are translated, if translation is necessary, by a precleared translator. Any documents not related to the inmate's post-sentencing proceedings must be sent to the inmate via general correspondence and will be subject to the mail provisions of subparagraphs 2(h) and 3(g).  Documents previously reviewed and cleared for receipt by the inmate, and already in the inmate's possession at the outset of the visit, may be discussed or reviewed by the inmate and the inmate's attorney during the visit.

i.   None of the materials provided may include inflammatory materials, materials relating to the dissemination of classified information, or materials that may be used to pass messages from inmate to inmate, unless such materials have been precleared by the CES/NSD and the FBI.

ii.   The CES/NSD may authorize additional documents to be presented to the inmate.  If any document not listed or described above needs to be transmitted to the inmate, consent for the transmission of the document can be obtained from the CES/NSD without the need to formally seek approval for an amendment to the SAM.

---

[4] Except by USMS/BOP/DF, FBI, CIA, DOJ or other duly authorized federal authorities. This section does not allow monitoring of attorney/client privileged communications.

LIMITED OFFICIAL USE

Approved for Release 8/11/2015

**SPECIAL ADMINISTRATIVE MEASURES (SAM)**
Pursuant to 28 C.F.R. § 501.2                                              Page 9
Inmate - Harold Nicholson

    h.    **Legal Mail**[5] - The inmate's attorney may not send, communicate, distribute, or divulge the inmate's mail, or any portion of its contents (legal or otherwise), to third parties, except as otherwise provided in Section 2(c).

        i.    In signing the SAM acknowledgment document, the inmate's attorney and precleared staff will acknowledge the restriction that only inmate case-related documents will be presented to the inmate, and that neither the attorney nor his staff will forward third-party mail to or from the inmate.

3.    **Inmate's Non-legal Contacts:**

    a.    **Non-legal Telephone Contacts -**

        i.    The inmate is limited to non-legal telephone calls with his immediate family members.[6] However, Nicholson's son, Nathaniel Nicholson, will not be permitted to have telephone calls with the inmate.

        ii.    The quantity and duration of the inmate's non-legal telephone calls with his immediate family members (except Nathaniel Nicholson) shall be set by the USMS/BOP/DF, with a minimum of one call per month.

    b.    **Rules for Telephone Calls -** For all non-legally privileged telephone calls or communications, no telephone call/communication, or portion thereof:

        i.    Is to be overheard by a third party.[7]

---

[5] Legal mail is defined as properly marked correspondence (marked "Legal Mail") addressed to or from the inmate's attorney. All other mail, including that otherwise defined by the USMS/BOP/DF as Special Mail, shall be processed as "non-legal mail."

[6] The inmate's "immediate family members" are defined as the inmate's (USMS/BOP/DF, FBI-verifiable) spouse, children, parents, and siblings. Requests for additional non-legal contacts may be submitted and will be considered on a case-by-case basis.

[7] For purposes of the SAM, "third party" does not include officials of the USMS/BOP/DF, FBI, CIA, DOJ, or other duly authorized federal authorities when monitoring in connection with their official duties.

**LIMITED OFFICIAL USE**

Approved for Release 8/11/2015

**SPECIAL ADMINISTRATIVE MEASURES (SAM)**                              Page 10
Pursuant to 28 C.F.R. § 501.2
Inmate - Harold Nicholson

ii.     Is to be patched through, or in any manner forwarded or transmitted, to a third party.

iii.    Shall be divulged in any manner to a third party.

iv.     Shall be in any manner recorded or preserved.[8]

All telephone calls shall be in English unless a fluent FBI, CIA, or USMS/BOP/DF approved interpreter is available to contemporaneously monitor the telephone call. Arranging for an interpreter may require at least fourteen days' advance notice.

c.      **Telephone SAM Restriction Notifications** - For all non-legal telephone calls to the inmate's immediate family member(s) (except Nathaniel Nicholson):

i.      The USMS/BOP/DF shall inform the inmate of the telephone SAM restrictions prior to each telephone call.

ii.     The USMS/BOP/DF shall verbally inform the inmate's immediate family member(s) (except Nathaniel Nicholson) on the opposite end of the inmate's telephone communication of the SAM restrictions. USMS/BOP/DF is only required to notify the inmate's communication recipient in English.

iii.    The USMS/BOP/DF shall document each such telephone notification.

d.      **Family Call Monitoring** - All calls with the inmate's immediate family member(s) (except Nathaniel Nicholson) shall be:

i.      Contemporaneously monitored by the FBI and/or the CIA.

ii.     Contemporaneously recorded (as directed by the FBI and/or the CIA) in a manner that allows such telephone calls to be analyzed for indication: the call is being used to pass messages soliciting or encouraging the disclosure of classified information, or to otherwise attempt to circumvent the SAM.

---

[8] Except by USMS/BOP/DF, FBI, CIA, DOJ, or other duly authorized federal authorities.

LIMITED OFFICIAL USE

Approved for Release 8/11/2015

**SPECIAL ADMINISTRATIVE MEASURES (SAM)**
Pursuant to 28 C.F.R. § 501.2                                          Page 11
Inmate - Harold Nicholson

    iii.    A copy of each inmate/immediate family member telephone call recording shall be provided by USMS/BOP/DF on a single, individual cassette tape or compact disk (per call) for forwarding to the FBI and/or the CIA. These recordings shall be forwarded on a call-by-call basis as soon as practicable.

  e.    **Improper Communications** - If telephone call monitoring or analysis reveals that any call or portion of a call involving the inmate contains any indication of a discussion of illegal activity, the soliciting of or encouraging of the disclosure of classified information, or actual or attempted circumvention of the SAM, the inmate shall not be permitted any further calls to his immediate family members for a period of time to be determined by USMS/BOP/DF. If contemporaneous monitoring reveals such inappropriate activity, the telephone call may be immediately terminated.

  f.    **Non-legal Visits** -

    i.    **Limited Visitors** - The inmate shall be permitted to visit only with his immediate family members. However, the inmate will not be permitted to visit with his son, Nathaniel Nicholson. The visitor's identity and family member relationship to the inmate will be confirmed by the USMS/BOP/DF and FBI and/or CIA in advance.

    ii.    **English Requirement** - All communications during non-legal inmate visits will be in English unless a fluent FBI, CIA, or USMS/BOP/DF approved interpreter is readily available to contemporaneously monitor the communication/visit.

    iii.    **Visit Criteria** - All non-legal visits shall be:

        (1)    Contemporaneously monitored by USMS/BOP/DF and/or FBI and/or CIA, in a manner that allows such visits to be analyzed for indications the visit is being used to pass messages soliciting or encouraging the disclosure of classified information, or to otherwise attempt to circumvent the SAM.

        (2)    Permitted only with a minimum of 14 calendar days' advance written notice to the USMS/BOP/DF facility where the inmate is housed.

<u>LIMITED OFFICIAL USE</u>

Approved for Release 8/11/2015

**SPECIAL ADMINISTRATIVE MEASURES (SAM)**
Pursuant to 28 C.F.R. § 501.2                                   Page 12
Inmate - Harold Nicholson

> (3)   Without any physical contact. All such meetings shall be non-contact to protect against harm to visitors or staff.
>
> (4)   Limited to one adult visitor at a time. However, FBI-verified grandchildren and step-grandchildren of the inmate may visit with a pre-approved adult visitor.

g.   **Non-legal Mail** - Non-legal mail is any mail not clearly and properly addressed to/from the inmate's attorney and marked "Legal Mail" (incoming or outgoing). Non-legal mail is limited to only the inmate's immediate family members (except Nathaniel Nicholson), U.S. courts, federal judges, U.S. Attorney's Offices, members of U.S. Congress, BOP, or other federal law enforcement entities.

   i.   **General correspondence with limitations:** Correspondence is restricted to immediate family members (except Nathaniel Nicholson). Volume and frequency of outgoing general correspondence with immediate family members (except Nathaniel Nicholson) may be limited to three pieces of paper (not larger than 8½" x 11"), double-sided, once per calendar week to a single recipient, at the discretion of the USMS/BOP/DF. The identity and family member relationship to the inmate will be confirmed by USMS/BOP/DF and FBI.

   ii.   **General correspondence without limitations:** There is no volume or frequency limitation on correspondence to/from U.S. courts, federal judges, U.S. Attorney's Offices, members of U.S. Congress, BOP, and other federal law enforcement entities, unless there is evidence of abuse of these privileges, threatening correspondence is detected, circumvention of the SAM is detected, or the quantity to be processed becomes unreasonable to the extent that efficient processing to protect the security, good order or discipline of the institution, the public, or national security may be jeopardized.

   iii.   All non-legal mail will be:

> (1)   **Copied** - Shall be copied (including the surface of the envelope) by the warden, or his/her designee, of the facility in which the inmate is housed.

<u>LIMITED OFFICIAL USE</u>

Approved for Release 8/11/2015

**SPECIAL ADMINISTRATIVE MEASURES (SAM)**                                    Page 13
Pursuant to 28 C.F.R. § 501.2
Inmate - Harold Nicholson

(2)   **Forwarded** - Shall be forwarded, in copy form, to the location designated by the FBI and/or the CIA.

(3)   **Analyzed** - After government analysis and approval, if appropriate, the inmate's incoming/outgoing non-legal mail will be forwarded to the USMS/BOP/DF for delivery to the inmate (incoming); or directly to the addressee (outgoing).

The federal government will forward the inmate's non-legal mail to the USMS/BOP/DF for delivery to the inmate or directly to the addressee after a review and analysis period of:

(a)   A reasonable time not to exceed fourteen (14) business days for mail that is written entirely in the English language.

(b)   A reasonable time not to exceed sixty (60) business days for any mail that includes writing in any language other than English, to allow for translation.

(c)   A reasonable time not to exceed sixty (60) business days for any mail where the federal government has reasonable suspicion to believe that a code was used, to allow for decoding.

iv.   **Mail Seizure** - If outgoing/incoming mail is determined by USMS/BOP/DF or FBI and/or the CIA to contain overt or covert discussions of or requests for illegal activities, the soliciting or encouraging the dissemination of classified information, or actual or attempted circumvention of the SAM, the mail shall not be delivered/forwarded to the intended recipient, but referred to the FBI and/or the CIA for appropriate action. Notification to the inmate of such seizures will comply with BOP regulations concerning such notification.

4.   **Communication With News Media:**

a.   The inmate will not be permitted to talk with, meet with, correspond with, or otherwise communicate with any member, or representative, of the news media, in

**LIMITED OFFICIAL USE**

Approved for Release 8/11/2015

**SPECIAL ADMINISTRATIVE MEASURES (SAM)**                    Page 14
Pursuant to 28 C.F.R. § 501.2
Inmate - Harold Nicholson

person, by telephone, by furnishing a recorded message, through the mail, through his attorney, through a third party, or otherwise.

5.    **Religious Visitation:**

   a.    The inmate shall not be allowed to engage in group prayer with other inmates.

   b.    If an FBI and/or USMS/BOP/DF approved religious representative is to be present for prayer with the inmate, the prayer shall be conducted as part of a contact or non-contact visit, at the discretion of the USMS/BOP/DF.

6.    **No Communal Cells and No Communication Between Cells:**

   a.    The inmate shall not be allowed to share a cell with another inmate.

   b.    The inmate shall be limited within the USMS/BOP/DF's reasonable efforts and existing confinement conditions, from communicating with any other inmate by making statements audible to other inmates or by sending notes to other inmates, except as permitted in Section 1(c), above.

7.    **Cellblock Procedures:**

   a.    The inmate shall be kept separated from other inmates as much as possible while in the cellblock area.

   b.    The inmate shall be limited, within USMS/BOP/DF's reasonable efforts and existing confinement conditions, from communicating with any other inmate while in the cellblock area.

8.    **Commissary Privileges:**

   a.    The USMS/BOP/DF shall restrict access to commissary items or any other objects determined by USMS/BOP/DF to be capable of being converted into dangerous instruments.

Approved for Release 8/11/2015

**SPECIAL ADMINISTRATIVE MEASURES (SAM)**                    Page 15
Pursuant to 28 C.F.R. § 501.2
Inmate - Harold Nicholson

9.      Access to Mass Communications:

To prevent the inmate from receiving and acting upon critically-timed information or information coded in a potentially undetectable manner, the inmate's access to materials of mass communication is restricted as follows:

a.      Publications/Newspapers -

i.      The inmate may have access to publications determined not to facilitate criminal activity or be detrimental to: national security; the security, good order or discipline of the institution; or the protection of the public. This determination is to be made by the BOP, in consultation with the CES/NSD.

ii.     Sections of the publication/newspaper that offer a forum for information to be passed by unknown and/or unverified individuals, including but not limited to classified advertisements and letters to the editor, should be removed from the publications/newspapers prior to distribution to the inmate.

iii.    If restricted by BOP rules, access to a publication will be denied. If acceptable, upon delivery, the BOP will review the publication and make the initial determination. If the FBI's and/or the CIA's expertise on national security or intelligence matters is required, the publication will be forwarded to the FBI and/or the CIA for review. The BOP will also forward the publication to the FBI and/or the CIA if translations are needed to make that determination. (In these cases, the FBI and/or the CIA shall respond to the BOP within fourteen (14) business days.) The inmate shall then have access to the remaining portions of the publications/newspapers deemed acceptable, in accordance with USMS/BOP/DF policy.

iv.     In order to avoid passing messages/information from inmate to inmate, the inmate shall be allowed to share institutionally-purchased publications/newspapers with other SAM inmates only after each publication/newspaper is physically screened by staff to ensure that messages cannot be passed between the SAM inmates. Publications/newspapers individually purchased by the inmate may not be shared with any other inmate.

LIMITED OFFICIAL USE

Approved for Release 8/11/2015

**SPECIAL ADMINISTRATIVE MEASURES (SAM)**                          Page 16
Pursuant to 28 C.F.R. § 501.2
Inmate - Harold Nicholson

    b.    **Television and Radio** - The inmate is authorized to have television and radio viewing and listening privileges, in accordance with standard and applicable USMS/BOP/DF policies and procedures.

    c.    **Termination or Limitation** - If the USMS/BOP/DF determines that the mass communications are being used as a vehicle to send messages to the inmate in violation of the SAM, the inmate's access may be limited or terminated for a period of time to be determined by the USMS/BOP/DF.

10.    **Access to Books:**

The inmate may have access to all books that do not facilitate criminal activity or present a substantial threat to national security or the security, discipline, or good order of the institution. This initial determination is to be made by the BOP and, if the BOP determines that the FBI's and/or the CIA's expertise on national security or intelligence matters is required, the book(s) will be forwarded to the FBI and/or the CIA for review. In conducting its analysis, the FBI and/or the CIA will determine whether access to the book by this particular inmate would pose a substantial threat to national security.

In order to avoid passing messages/information from inmate to inmate, the inmate shall be allowed to share institutionally-purchased books with other SAM inmates only after each book is physically screened by staff to ensure that messages cannot be passed between the SAM inmates. Books individually purchased by the inmate may not be shared with any other inmate.

11.    **Transfer of Custody:**

In the event that the inmate is transferred to or from the custody of the USMS, BOP or any other DF, the SAM provisions authorized for this inmate will continue in effect, without need for any additional DOJ authorization.

**CONCLUSION**

The SAM set forth herein, especially as they relate to attorney/client-privileged communications and non-legal contact, are reasonably necessary to prevent the inmate from revealing classified information. Moreover, these measures are the least restrictive that can be tolerated in light of the ability of this inmate to divulged such classified information.

<u>LIMITED OFFICIAL USE</u>

Approved for Release 8/11/2015

**SPECIAL ADMINISTRATIVE MEASURES (SAM)**
Pursuant to 28 C.F.R. § 501.2                                             Page 17
Inmate - Harold Nicholson

The SAM, with respect to mail privileges, are reasonably necessary to prevent the inmate from transmitting classified information. Although I recognize that eliminating the inmate's mail privileges entirely may be an excessive measure except in the most egregious of circumstances, I believe that delaying mail delivery and allowing authorized personnel to examine a copy of the mail, is sufficient at this time to interrupt any communication of classified information. Under this procedure, the inmate can relate personal news to family members, even if delayed, but he may find it difficult or unwise to pass along restricted information in light of these procedures.

The SAM's prohibition of contact with the media is reasonably necessary. Communication with the media could pose a substantial risk of disclosure of classified information. Based upon the inmate's past behavior, I believe that it would be unwise to wait until after the inmate attempts to disclose classified information to impose such media restrictions.

The SAM's limitations on access to newspapers, publications, television and radio are reasonably necessary to prevent the inmate from receiving and transmitting classified information or information coded in a potentially undetectable manner. Such messages may be placed in advertisements or communicated through other means, such as the television and/or radio. Although I recognize that eliminating the inmate's access to such media may be an excessive measure except in the most egregious of circumstances, I believe that limiting and/or delaying such access may interrupt communication patterns the inmate may develop with the outside world, and ensure that the media is not used to communicate information which threatens the national security.

## SAM CONTACT INFORMATION

Any questions that you or your staff may have about this memorandum or the SAM directed herein should be directed to the Office of Enforcement Operations, Criminal Division, U.S. Department of Justice, 1301 New York Avenue, N.W., JCK Building, Room 1200, Washington, DC, 20530-0001; telephone (202) 514-6809; and facsimile (202) 616-8256.

LIMITED OFFICIAL USE

Approved for Release 8/14/2015



**U.S. Department of Justice**
**Federal Bureau of Prisons**

*United States Penitentiary —*
*Administrative Maximum*

*Florence, Colorado  81226*

April 6, 2015

NOTICE TO        HAROLD NICHOLSON, REG. NO. 49535-083

FROM:            J. Oliver, Complex Warden

SUBJECT:         **Notification of Modification of Special Administrative**
                 **Measures (SAM)**

Pursuant to the authority of the Attorney General, as set forth in Provision 1 (b) of the
original SAM, a modification of your SAM has been made.  According to the Central
Intelligence Agency (CIA) and the Federal Bureau of Investigation (FBI), you have been
violating the SAM restrictions by asking your parents to pass third party messages.  The
Counterespionage Section, National Security Division (CES/NSD), in conjunction with
the CIA and FBI, is therefore asking that your SAM be modified to restrict your nonlegal
telephone and visitation contact with your parents, Marvin and Betty Nicholson.  (You
are already prohibited from having any contact with your son, Nathaniel Nicholson, who
conspired with you to provide information to the Russian Federation in return for
money).  Correspondence between you and your parents is not affected by this
modification and will continue to be permitted.  Accordingly, this notice modifies
portions of Section 3 of your SAM, as follows:

3.   <u>**Inmate's Nonlegal Contacts:**</u>

    a.   **Nonlegally Privileged Telephone Contacts –**

        i.   You are limited to nonlegally privileged telephone calls with your
immediate family members.  However, you shall not be permitted to
have telephone contact with your son, Nathaniel Nicholson; your father,
Marvin Nicholson; and your mother, Betty Nicholson.[1]

---

[1] The inmate's "immediate family members" are defined as the inmate's (USMS/BOP/
DF/ATF verifiable) spouse, children, parents, and siblings.  Requests for additional

**"Sensitive But Unclassified"**

Approved for Release 8/11/2015

Notification of Modification of Special Administrative Measures  ← *Incorrect Name & No*
Michael McElhiney, Reg. No. 04198-097
January 26, 2015
Page 2

    ii.    The quantity and duration of your nonlegally privileged telephone calls with your immediate family members, except Nathaniel Nicholson, Marvin Nicholson, and Betty Nicholson, with whom you are not allowed to have telephone contact, shall be set by the USMS/BOP/DF, with a minimum of one call per month.

**b.**    **No change required**

**c.**    **Telephone SAM Restriction Notifications** – For all nonlegal telephone calls to your immediate family member(s), except Nathaniel Nicholson, Marvin Nicholson, and Betty Nicholson, with whom you are not allowed to have telephone contact:

    i.    The USMS/BOP/DF shall inform you of the telephone SAM restrictions prior to each telephone call.

    ii.    The USMS/BOP/DF shall verbally inform your immediate family member(s), except Nathaniel Nicholson, Marvin Nicholson, and Betty Nicholson, with whom you are not allowed to have telephone contact, on the opposite end of your telephone communication of the SAM restrictions.  The USMS/BOP/DF is only required to notify your communication recipient in English.

    iii.    The USMS/BOP/DF shall document each such telephone notification.

**d.**    **Family Call Monitoring** – All calls with your immediate family member(s), except Nathaniel Nicholson, Marvin Nicholson, and Betty Nicholson, with whom you are not allowed to have telephone contact, shall be:

    i.    Contemporaneously monitored by the ATF.

    ii.    Contemporaneously recorded (as directed by the ATF) in a manner that allows such telephone calls to be analyzed for indications the call is being used to pass messages soliciting or encouraging acts of violence or other crimes, or to otherwise attempt to circumvent the SAM.

---

nonlegal contacts may be submitted and will be considered on a case-by-case basis.

**"Sensitive But Unclassified"**

Approved for Release 8/11/2015

Notification of Modification of Special Administrative Measures     *Incorrect Name & No.*
Michael McElhiney, Reg. No. 04198-097
January 26, 2015
Page 3

    iii.    A copy of each inmate/immediate family member telephone call recording shall be provided to the FBI by the USMS/BOP/DF. These recordings shall be forwarded on a call-by-call basis as soon as practicable.

  e.  **Improper Communication** – If telephone call monitoring or analysis reveals that any call or portion of a call involving you contains any indication of a discussion of illegal activity, the soliciting of or encouraging of acts of violence, or actual or attempted circumvention of the SAM, you shall not be permitted any further calls to your immediate family members for a period of time to be determined by the USMS/BOP/DF. If contemporaneous monitoring reveals such inappropriate activity, the telephone call may be immediately terminated.

  f.  **Nonlegal Visits** –

    i.    **Limited Visitors** – You shall be permitted to visit only with your immediate family members. However, you shall not be permitted to visit with Nathaniel Nicholson, Marvin Nicholson, and Betty Nicholson. The visitor's identity and family member relationship to you will be confirmed by the USMS/BOP/DF and FBI in advance.

All other SAM provisions will continue in full force and effect for the remainder of the current authorization periods, subject to further discretion.

Received: April _____, 2015
        (3 pages)                  _____
                                  Harold Nicholson
                                  Reg. No. 49535-083

**"Sensitive But Unclassified"**

Approved for Release 8/11/2015
EXHIBIT



U.S. Department of Justice
Federal Bureau of Prisons

*United States Penitentiary –*
*Administrative Maximum*

Florence, Colorado  81226

June 26, 2015

**NOTICE TO:**      HAROLD NICHOLSON, REG. NO. 49535-083

**FROM:**              J. Oliver, Complex Warden

**SUBJECT:**       **Notification of Extension Special Administrative Measures**

You pled guilty in 1997 to conspiracy to commit espionage between 1994 and 1996. In 2010, you pled guilty to conspiracy to act as an agent of a foreign government without prior notification to the Attorney General, and conspiracy to commit money laundering, which you committed while incarcerated by the Federal Bureau of Prisons (BOP). In June 2011, the Attorney General authorized the imposition of Special Administrative Measures (SAM).

As detailed in the request from the Chief of the Counterintelligence and Export Control Section, National Security Division (CES/NSD) of the Department of Justice, which is supported by the Central Intelligence Agency (CIA) and the Federal Bureau of Investigation (FBI), between June 1994 and November 16, 1996, you provided the Russian Federation with documents and other information relating to the national defense of the United States, with the intent and reason to believe that the documents and information would be used to the injury of the United States and to the advantage of the Russian Federation. This unauthorized disclosure of classified information resulted in damage to national security operations. You were sentenced to 23 years and 7 months in prison.

As part of your plea agreement in 1997, you acknowledged your continuing obligations with respect to secrecy associated with your employment with the Central Intelligence Agency (CIA). You also agreed to have "no contact with any foreign government or agents thereof, and ... not see or accept, personally or through another person or entity, any benefit from such government," including through any member of your family, which agreement you repeatedly violated.

The FBI investigation subsequently revealed that while incarcerated at FCI Sheridan, you used your youngest son, Nathaniel Nicholson (Nathaniel), to provide information to the Russian government in exchange for cash payments. Nathaniel visited you regularly, and you also communicated through telephone and written correspondence. At your direction, Nathaniel met with Russian government representatives outside the

Approved for Release 8/11/2015

Notification of Extension of Special Administrative Measures
Harold Nicholson, Reg. No. 49535-083
June 26, 2015
Page 2

United States and gave them information provided by you. These communications between you and the Russian government, with Nathaniel acting as an intermediary, took place even as your outgoing prison calls were being recorded for CIA review, your outgoing mail was being sent to the CIA for classification review, and the CIA was approving your visitors, all part of communication security restrictions that were put in place as part of your 1997 plea agreement.

Federal Bureau of Investigation investigation further disclosed that between December 2006 and December 2008, Nathaniel traveled overseas to meet with Russian officials and returned from those meetings with cash the Russians had given him in amounts under $10,000, to avoid currency reporting requirements. You were aware of these trips before they occurred and provided direction to Nathaniel with respect to Nathaniel's interactions with Russian officials, as well as methods to avoid detection by U.S. law enforcement. You used Nathaniel to smuggle notes out of the prison to be provided to the Russian officials, along with instructions as to how to handle the case Nathaniel received from the Russians. CIA review of monitored communications between you and your son revealed numerous coded conversations relating to Nathaniel's travels in connections with this scheme.

On December 15, 2008, following his return to Oregon from a trip to Cyprus, the FBI interviewed Nathaniel about his overseas travel. At that time, Nathaniel admitted to meeting with Russian officials and to receiving cash from them, and stated that he had given the Russians notes from you that he had smuggled out of the prison. You refused to cooperate when confronted with evidence of your son's illicit activities on your behalf. Both you and Nathaniel Nicholson were indicted in January 2009 on conspiracy and money laundering charges relating to their unreported and illegal agency for the Russian Federation.[1]

Your behavior suggests that there has been no change in your proclivities or sympathies. Despite your two guilty pleas, at your sentencing in January 2011, you apologized to the Russian Federation for any embarrassment your conviction caused that government. In April 2003, BOP forwarded to the CIA an analysis of a letter from

---

[1] On August 29, 2009, Nathaniel Nicholson entered a plea of guilty to two counts of the indictment: conspiracy to act as an agent of a foreign government without prior notification to the Attorney General, and conspiracy to commit money laundering. He received a sentence of five years' probation as a result of mitigating circumstances (including his father's manipulation of him) and his cooperation against his father.

**"Sensitive But Unclassified"**

Approved for Release 8/11/2015

Notification of Extension of Special Administrative Measures
Harold Nicholson, Reg. No. 49535-083
June 26, 2015
Page 3

you to a family member in which you appeared to attempt to circumvent the SAM by
encouraging the family member to relay a message for you to an unauthorized third
party overseas.

The CIA reports that the BOP suspended your mail and telephone privileges for six
months between September 2013 and March 2014, for violating the terms of the SAM.
Specifically, based on CIA analysis of your mail and telephone conversations, the BOP
determined that on a few occasions between June and August 2013, you had
communicated cryptically with a family member about the same unauthorized third
party, and that family member would later correspond with and send packages to that
same individual on your behalf, in violation of the SAM prohibition on passing messages
to third parties.

In March 2015, the CIA and FBI reported that you had been violating the SAM
restrictions by asking your parents to pass messages to an unauthorized third party. In
a November 11, 2014, letter, you instructed your mother in a cryptic manner to send a
scarf to a foreign national with whom you are not authorized to have contact. Shortly
thereafter, you reiterated your instructions to your mother regarding sending the scarf in
a November 14, 2014, telephone call. Based on the above information, on April 1,
2015, the SAM was modified to restrict your nonlegal telephone and visitation contact
with your parents.

In his letter dated May 26, 2015, the Director of the CIA certified, pursuant to 28 C.F.R.
§ 501.2, that the continued implementation of the SAM is reasonably necessary to
prevent disclosure of classified information by you, and that the disclosure of such
information would pose a threat to the national security.

Based upon information provided, including your service as a clandestine agent for the
Russian Federation and your illegal activities and communications while incarcerated, it
was found there is a danger that you will disclose classified information, that the
unauthorized disclosure of such information would pose a threat to the national security
of the United States, and that SAM on you are reasonably necessary to prevent
disclosure of such information.

Therefore, pursuant to 28 C.F.R. § 501.2, we will continue to implement the SAM to
restrict your access to the mail, the media, the telephone, and visitors. This SAM will
commence immediately upon expiration of the prior SAM authorization period and will
be in effect for one year, subject to further direction.

**"Sensitive But Unclassified"**

Approved for Release 8/11/2015

Notification of Extension of Special Administrative Measures
Harold Nicholson, Reg. No. 49535-083
June 26, 2015
Page 4

1.   **General Provisions:**

   a.   **Adherence to Usual United States Marshals Service (USMS), BOP, and Detention Facility (DF) Policy Requirements** – In addition to the below listed SAM, you must comply with all usual USMS, BOP, and non-BOP DF policies regarding restrictions, activities, privileges, communications, etc. If there is a conflict between the USMS/BOP/DF policies and the SAM, as set forth herein, where the SAM is more restrictive than usual USMS/BOP/DF policies, then the SAM shall control. If usual USMS/BOP/DF policies are more restrictive than the SAM, then the USMS/BOP/DF policies shall control.

   b.   **Interim SAM Modification Authority** – During the term of this directive, the Director, Office of Enforcement Operations (OEO), Criminal Division, may modify your SAM as long as any SAM modification authorized by OEO:

   i.   Does not create a more restrictive SAM;

   ii.   Is not in conflict with the request of the Section Chief, Counterintelligence and Export Control, National Security Division (CES/NSD), FBI, CIA, or USMS/BOP/ DF, or applicable regulations; and

   iii.   Is not objected to by the CES/NSD, FBI, CIA, or USMS/BOP/DF.

   c.   **Inmate Communications Prohibitions** –

   i.   You are limited, within the USMS/BOP/DF's reasonable efforts and existing confinement conditions, from having contact (including passing or receiving any oral, written, or recorded communications) with any other inmate, visitor, attorney, or anyone else except as outlined and allowed by this document that could reasonably foreseeably result in you communicating information (sending or receiving) that could circumvent the SAM's intent of significantly limiting your ability to communicate (send or receive) classified information or other information with the intent to harm others.

   ii.   The USMS/BOP/DF may permit you to communicate with other SAM inmates orally only during certain predesignated times, the place and duration to be set by the USMS/BOP/DF. You shall not have any

**"Sensitive But Unclassified"**

Approved for Release 8/11/2015

Notification of Extension of Special Administrative Measures
Harold Nicholson, Reg. No. 49535-083
June 26, 2015
Page 5

physical contact with other inmates during this predesignated time, and all such predesignated sessions will be monitored and/or recorded. Upon request of the FBI and/or the CIA, a copy of the recordings will be provided by the USMS/BOP/DF to the FBI and/or the CIA to be analyzed for indications that you are attempting to pass classified information or other information with the intent to harm others. — never an issue

2.   **Attorney/Client Provisions:**

a.   **Attorney[2] Affirmation of Receipt of the SAM Restrictions Document –** Your attorney (or counsel) – individually by each if more than one – must sign an affirmation acknowledging receipt of the SAM restrictions document. By signing the affirmation, the attorney acknowledges his/her awareness and understanding of the SAM provisions and his/her agreement to abide by these provisions, particularly those that relate to contact between you and your attorney and the attorney's staff. The signing of the affirmation does not serve as an endorsement of the SAM or the conditions of confinement, and does not serve to attest to any of the factors set forth in the conclusions supporting the SAM. However, in signing the affirmation, your attorney and precleared staff[3] acknowledge the restriction that they will not forward third party messages to or from you.

---

[2] The term "attorney" refers to the inmate's attorney of record, who has been verified and documented by the CES/NSD, and who has received and acknowledged receipt of the SAM restrictions document. As used in this document, "attorney" also refers to more than one attorney where the inmate is represented by two or more attorneys, and the provisions of this document shall be fully applicable to each such attorney in his/her individual capacity.

[3] "Precleared" when used with regard to an attorney's staff, or "precleared staff member," refers to a co-counsel, paralegal, or an investigator who is actively assisting the inmate's attorney with the inmate's defense, who has submitted to a background check by the FBI and CES/NSD, who has successfully been cleared by the FBI and CES/NSD, and who has received a copy of the inmate's SAM and has agreed -- as evidenced by his/her signature – to adhere to the SAM restrictions and requirements. As used in this document, "staff member" also refers to more than one staff member, and the provisions of this document shall be fully applicable to each such staff member in his/her individual capacity. A "paralegal" will also be governed by any additional DF rules and regulations concerning paralegals.

**"Sensitive But Unclassified"**

Approved for Release 8/11/2015

Notification of Extension of Special Administrative Measures
Harold Nicholson, Reg. No. 49535-083
June 26, 2015
Page 6

    i.    The CES/NSD shall present, or forward, the attorney affirmation of receipt of the SAM restrictions document to your attorney.

    ii.   After initiation of the SAM and prior to your attorney being permitted to have attorney/client privileged contact with you, your attorney shall execute a document affirming receipt of the SAM restrictions document and return the original to the CES/NSD.

    iii.  The CES/NSD shall maintain the original of the SAM acknowledgment document and forward a copy of the signed document to OEO in Washington, D.C. and the USMS/BOP/DF.

**b.**   **Attorney/Client Privileged Visits** – Attorney/client privileged visits may be contact or noncontact, at the discretion of the USMS/BOP/DF.

**c.**   **Attorney May Disseminate Inmate Conversations** – Your attorney may disseminate the contents of your communication to third parties for the sole purpose of providing necessary legal services related to your post-sentencing proceedings – and not for any other reason – on the understanding that any such dissemination shall be made solely by your attorney, and not by the attorney's staff.

**d.**   **Unaccompanied Attorney's Precleared Paralegal(s) May Meet with Client** – Your attorney's precleared paralegal(s) may meet with you without the need for your attorney to be present. These meetings may be contact or noncontact, at the discretion of the USMS/BOP/DF.

**e.**   **Simultaneous Multiple Legal Visitors** – You may have multiple legal visitors provided that at least one of the multiple legal visitors consists of your attorney or precleared paralegal. These meetings may be contact or noncontact, at the discretion of the USMS/BOP/DF. An investigator or interpreter/translator may not meet alone with you.

**f.**   **Legally Privileged Telephone Calls** – The following rules refer to all legally privileged telephone calls or communications:

    i.    Inmate's Attorney's Precleared Staff May Participate in Inmate Telephone Calls – Your attorney's precleared staff are permitted to

**"Sensitive But Unclassified"**

Approved for Release 8/11/2015

Notification of Extension of Special Administrative Measures
Harold Nicholson, Reg. No. 49535-083
June 26, 2015
Page 7

communicate directly with you by telephone, provided that your attorney is physically present and participating in the legal call as well.

ii.   Inmate's Initiation of Legally Privileged Telephone Calls – Your initiated telephone communications with your attorney or precleared staff are to be placed by a USMS/BOP/DF staff member and the telephone handed over to you only after the USMS/BOP/DF staff member confirms that the person on the other end of the line is your attorney.  This privilege is contingent upon the following additional restrictions:

   1)   Your attorney will not allow any non-precleared person to communicate with you, or to take part in and/or listen to or overhear any communications with you.

   2)   Your attorney must instruct his/her staff that:

      a)   Your attorney and precleared staff are the only persons allowed to engage in communications with you.

      b)   The attorney's staff (including the attorney) are not to patch through, forward, transmit, or send your communications to third parties.

   3)   No telephone call/communication, or portion thereof, except as specifically authorized by this document:

      a)   Is to be overheard by a third party.[4]

      b)   Will be patched through, or in any manner forwarded or transmitted to a third party.

      c)   Shall be divulged in any manner to a third party, except as otherwise provided in Section 2(c) above.

---

[4] For purposes of the SAM, "third party" does not include officials of the USMS/BOP/ DF, FBI, CIA, DOJ, or other duly authorized federal authorities when acting in connection with their official duties.  This section does not allow monitoring of attorney/client privileged communications.

**"Sensitive But Unclassified"**

Approved for Release 8/11/2015

Notification of Extension of Special Administrative Measures
Harold Nicholson, Reg. No. 49535-083
June 26, 2015
Page 8

    d)   Shall be in any manner recorded and preserved.[5]  Your attorney may make written notes of attorney client privileged communications.

    4)   If the USMS/BOP/DF, FBI, or CES/NSD determines that you have used or are using the opportunity to make a legal call to speak with another inmate or for any other reason unrelated to your legal proceedings that would circumvent the intent of the SAM, your ability to contact your attorney by telephone may be suspended or eliminated.

g.   **Documents Provided by Attorney to Inmate** – During a visit, your attorney may provide you with or review with you, documents related to your post-sentencing proceedings and/or material prepared by your attorney relating to such proceedings, so long as any of the foregoing documents are translated, if translation is necessary, by a precleared translator.  Any documents not related to your post-sentencing proceedings must be sent to you via general correspondence and will be subject to the mail review provisions of subparagraphs 2(h) and 3(g).  Documents previously reviewed and cleared for receipt by you, and already in your possession at the outset of the visit, may be discussed or reviewed by you and your attorney during the visit.

    i.   None of the materials provided may include inflammatory materials, materials relating to the dissemination of classified information, or materials that may be used to pass messages from inmate to inmate, unless such materials have been precleared by the CES/NSD and FBI.

    ii.   The CES/NSD may authorize additional documents to be presented to you.  If any documents not listed or described above need to be transmitted to you, consent for the transmission of the document can be obtained from the CES/NSD without the need to formally seek approval for an amendment to the SAM.

---

[5] Except by the USMS/BOP/DF/FBI/CIA/DOJ or other duly authorized federal authorities.  This section does not allow monitoring of attorney/client privileged communications.

**"Sensitive But Unclassified"**

Approved for Release 8/11/2015

Notification of Extension of Special Administrative Measures
Harold Nicholson, Reg. No. 49535-083
June 26, 2015
Page 9

    h.    **Legal Mail**[6] – Your attorney may not send, communicate, distribute, or divulge your mail, or any portion of its contents (legal or otherwise), to third parties, except when disclosure of the contents is necessary for the sole purpose of providing necessary legal services related to your post-sentencing proceedings – and not for any other reason. In signing the SAM acknowledgement document, your attorney and precleared staff will acknowledge the restriction that only inmate case-related documents will be presented to you, and that neither the attorney nor his/her staff will forward third party mail to and from you.

3.    **Inmate's Nonlegal Contacts:**

    a.    **Nonlegally Privileged Telephone Contacts** –

        i.    You are limited to nonlegally privileged telephone calls with your immediate family members[7]. However, your son, Nathaniel Nicholson, and your parents, Marvin and Betty Nicholson, will not be permitted to have telephone calls with you.

        ii.    The quantity and duration of your nonlegal telephone calls with your immediate family members (except Nathaniel Nicholson, Marvin Nicholson, and Betty Nicholson) shall be set by the USMS/BOP/DF, with a minimum of one call per month.

    b.    **Rules for Telephone Calls** – For all nonlegally privileged telephone calls or communications, no telephone call/communication, or portion thereof:

        i.    Is to be overheard by a third party.

---

[6] Legal mail is defined as properly marked correspondence (marked "Legal Mail") addressed to or from the inmate's attorney. All other mail, including that otherwise defined by the USMS/BOP/DF as Special Mail, shall be processed as "nonlegal mail."
[7] The inmate's "immediate family members" are defined as the inmate's (USMS/BOP/ DF/FBI verifiable) spouse, children, parents, and siblings. Requests for additional nonlegal contacts (whether telephone, visits, or mail) may be submitted and will be considered on a case-by-case basis.

**"Sensitive But Unclassified"**

Approved for Release 8/11/2015

Notification of Extension of Special Administrative Measures
Harold Nicholson, Reg. No. 49535-083
June 26, 2015
Page 10

    ii.    Is to be patched through, or in any manner forwarded or transmitted, to a third party.

    iii.    Shall be divulged in any manner to a third party.

    iv.    Shall be in any manner recorded or preserved.[8]

All telephone calls shall be in English unless a fluent FBI, CIA, or USMS/BOP/DF approved interpreter/translator is available to contemporaneously monitor the telephone call. Arranging for an interpreter/translator may require at least 14 days' advance notice.

c.    **Telephone SAM Restriction Notifications** – For all nonlegally privileged telephone calls to your immediate family member(s) (except Nathaniel Nicholson, Marvin Nicholson, and Betty Nicholson):

    i.    The USMS/BOP/DF shall inform you of the telephone SAM restrictions prior to each telephone call.

    ii.    The USMS/BOP/DF shall verbally inform your immediate family member(s) (except Nathaniel Nicholson, Marvin Nicholson, and Betty Nicholson) on the opposite end of your telephone communication of the SAM restrictions. The USMS/BOP/DF is only required to notify your communication recipient in English.

    iii.    The USMS/BOP/DF shall document each such telephone notification.

d.    **Family Call Monitoring** – All calls with your immediate family member(s), except Nathaniel Nicholson, Marvin Nicholson, and Betty Nicholson, with whom you are not allowed to have telephone contact, may be:

    i.    Contemporaneously monitored by the FBI and/or CIA.

    ii.    Contemporaneously recorded (as directed by the FBI and/or CIA) in a manner that allows such telephone calls to be analyzed for indications

---

[8] Except for the USMS/BOP/DF/FBI/CIA/DOJ or other duly authorized federal authorities.

**"Sensitive But Unclassified"**

Approved for Release 8/11/2015

Notification of Extension of Special Administrative Measures
Harold Nicholson, Reg. No. 49535-083
June 26, 2015
Page 11

the call is being used to pass messages soliciting or encouraging the disclosure of classified information, or to otherwise attempt to circumvent the SAM.

iii.   A copy of each telephone call recording involving an inmate/immediate family member to the FBI and/or CIA by the USMS/BOP/DF. These recordings shall be forwarded on a call-by-call basis as soon as practicable.

e.   **Improper Communication** – If telephone call monitoring or analysis reveals that any call or portion of a call involving you contains any indication of a discussion of illegal activity, the soliciting of or encouraging of the disclosure of classified information, or actual or attempted circumvention of the SAM, you shall not be permitted any further calls to your immediate family members for a period of time to be determined by the USMS/BOP/DF. If contemporaneous monitoring reveals such inappropriate activity, the telephone call may be immediately terminated.

f.   **Nonlegal Visits** –

i.   **Limited Visitors** – You shall be permitted to visit only with your immediate family members. However, you will not be permitted to visit with your son, Nathaniel Nicholson, or your parents, Marvin and Betty Nicholson. The visitor's identity and family member relationship to you will be confirmed by the USMS/BOP/DF and FBI and/or CIA in advance.

1)   In addition, FBI Special Agent Dean Aker, Colorado Springs Resident Agency, is authorized to meet with you on an ongoing basis, provided the FBI has coordinated the meetings with the USMS/BOP/DF.

ii.   **English Requirement** – All communications during your nonlegal visits will be in English unless a fluent FBI, CIA, or USMS/BOP/DF approved interpreter/translator is readily available to contemporaneously monitor the communication/visit. Arranging for an interpreter may require at least 14 days' advance notice.

iii.   **Visit Criteria** – All nonlegal visits shall be:

**"Sensitive But Unclassified"**

Approved for Release 8/11/2015

Notification of Extension of Special Administrative Measures
Harold Nicholson, Reg. No. 49535-083
June 26, 2015
Page 12

1)  Contemporaneously monitored by the USMS/BOP/DF and/or FBI and/or CIA, in a manner that allows such visits to be analyzed for indications the visit is being used to pass messages soliciting or encouraging the disclosure of classified information, or to otherwise attempt to circumvent the SAM.

2)  Permitted only with a minimum of 14 calendar days' advance written notice to the USMS/BOP/DF facility where you are housed.

3)  Without any physical contact.  All such meetings shall be noncontact to protect against harm to visitors or staff.

4)  Limited to one adult visitor at a time.  However, your FBI verified grandchildren and step-grandchildren may visit with a preapproved adult visitor.

g.  **Nonlegal Mail** – Nonlegal mail is any mail not clearly and properly addressed to/from your attorney and marked "Legal Mail" (incoming and outgoing). Nonlegal mail is only authorized with your immediate family members (except Nathaniel Nicholson), U.S. courts, federal judges, U.S. Attorney's Offices, member of U.S. Congress, the BOP, and other federal law enforcement entities.

i.  **General correspondence with limitations:**  Correspondence is restricted to immediate family members (except Nathaniel Nicholson). The volume and frequency of outgoing general correspondence with immediate family members (except Nathaniel Nicholson) may be limited to three pieces of paper (not larger than 8 ½ x 11), double-sided, once per calendar week to a single recipient, at the discretion of the USMS/ BOP/DF.  The identity and your family member relationship will be confirmed by the USMS/BOP/DF and FBI.

ii.  **General correspondence without limitations:**  There is no volume or frequency limitation on correspondence to/from U.S. courts, federal judges, U.S. Attorney's Offices, members of U.S. Congress, the BOP, and other federal law enforcement entities unless there is evidence of abuse of these privileges, threatening correspondence is detected, circumvention of the SAM is detected, or the quantity to be processed

**"Sensitive But Unclassified"**

Approved for Release 8/11/2015

Notification of Extension of Special Administrative Measures
Harold Nicholson, Reg. No. 49535-083
June 26, 2015
Page 13

becomes unreasonable to the extent that efficient processing to protect the security, good order or discipline of the institution, the public or national security may be jeopardized.

iii.   **All nonlegal mail will be:**

1)   **Copied** – Shall be copied (including the surface of the envelope) by the warden, or his/her designee, of the facility in which you are housed.

2)   **Forwarded** – Shall be forwarded, in copy form, to the location designated by the FBI and/or CIA.

3)   **Analyzed** – After government analysis and approval, if appropriate, your incoming/outgoing nonlegal mail will be forwarded to the USMS/BOP/DF for delivery to you (incoming); or directly to the addressee (outgoing).

iv.   The federal government will forward your nonlegal mail to the USMS/BOP/DF for delivery to you or directly to the addressee after a review and analysis period of:

1)   A reasonable time not to exceed 14 business days for mail which is written entirely in the English language.

2)   A reasonable time not to exceed 60 business days for any mail which includes writing in any language other than English, to allow for translation.

3)   A reasonable time not to exceed 60 business days for any mail where the federal government has reasonable suspicion to believe that a code was used, to allow for decoding.

v.   **Mail Seizure** – If outgoing/incoming mail is determined by the USMS/BOP/DF, FBI, or CIA to contain overt or covert discussion of or requests for illegal activities, the soliciting or encouraging the dissemination of classified information, or actual or attempted circumvention of the SAM, the mail shall not be delivered/forwarded to

**"Sensitive But Unclassified"**

Approved for Release 8/11/2015

Notification of Extension of Special Administrative Measures
Harold Nicholson, Reg. No. 49535-083
June 26, 2015
Page 14

the intended recipient but referred to the FBI and/or CIA for appropriate action. You shall be notified in writing of the seizure of any mail.

4. **Communication with News Media**: You shall not be permitted to talk with, meet with, correspond with, or otherwise communicate with any member, or representative, of the news media, in person, by telephone, by furnishing a recorded message, through the mail, through your attorney, through a third party, or otherwise.

5. **Religious Visitation:**

  a. You shall not be allowed to engage in group prayer with other inmates.

  b. If an FBI and/or USMS/BOP/DF approved religious representative is to be present for prayer with you, the prayer shall be conducted as part of a noncontact visit, at the discretion of the USMS/BOP/DF.

6. **No Communal Cells and No Communication Between Cells:**

  a. You shall not be allowed to share a cell with another inmate.

  b. You shall be limited within the USMS/BOP/DF's reasonable efforts and existing confinement conditions, from communicating with any other inmate by making statements audible to other inmates or by sending notes to other inmates, except as permitted in Section 1c above.

7. **Cellblock Procedures:**

  a. You shall be kept separated from other inmates as much as possible while in the cellblock area.

  b. You shall be limited, within the USMS/BOP/DF's reasonable efforts and existing confinement conditions, from communicating with any other inmate while in the cellblock area.

8. **Access to Mass Communications:** To prevent you from receiving and acting upon critically-timed information or information coded in a potentially undetectable manner, your access to materials of mass communication is restricted as follows:

**"Sensitive But Unclassified"**

Approved for Release 8/11/2015

Notification of Extension of Special Administrative Measures
Harold Nicholson, Reg. No. 49535-083
June 26, 2015
Page 15

a.   **Publications/Newspapers** –

   i.   You may have access to publications determined not to facilitate criminal activity or be detrimental to: national security; the security, good order or discipline of the institution; or the protection of the public. This determination is to be made by the USMS/BOP/DF, in consultation with the CES/NSD. You may correspond with the publishing company regarding technical aspects of the publication, i.e., availability of particular volumes, billing questions, etc. The review of this correspondence will be in accordance with section 8(a) (iii), below.

   ii.   Sections of the publication/newspaper which offer a forum for information to be passed by unknown and/or unverified individuals, including but not limited to classified advertisements and letters to the editor, should be removed from the publications/newspapers prior to distribution to you.

   iii.   If restricted by the USMS/BOP/DF rules, access to a publication will be denied. If acceptable, upon delivery, the USMS/BOP/DF will review the publication and make the initial determination. If the FBI's and/or CIA's expertise is required, the publication will be forwarded to the FBI and/or CIA for review. The USMS/BOP/DF will also forward the publication to the FBI and/or CIA if translations are needed to make that determination. (In these cases, the FBI and/or CIA shall respond to the USMS/BOP/DF within 14 business days.) You shall then have access to the remaining portions of the publications/newspapers deemed acceptable, in accordance with the USMS/BOP/DF policy.

   iv.   In order to avoid passing messages/information from inmate to inmate, you shall be allowed to share institutionally purchased publications/newspapers with other SAM inmates only after each publication/newspaper is physically screened by staff to ensure that messages cannot be passed between the SAM inmates. Publications/newspapers individually purchased by you may not be shared with any other inmate.

b.   **Television and Radio** – You are authorized to have television and radio viewing and listening privileges, in accordance with standard and applicable USMS/BOP/DF policies and procedures.

**"Sensitive But Unclassified"**

Approved for Release 8/11/2015

Notification of Extension of Special Administrative Measures
Harold Nicholson, Reg. No. 49535-083
June 26, 2015
Page 16

    c.   **Termination or Limitation** – If the USMS/BOP/DF determines that the mass communications are being used as a vehicle to send messages to you in violation of the SAM, your access may be limited or terminated for a period of time to be determined by the USMS/BOP/DF.

9.  **Access to Books:**

    a.   You may have access to all books that do not facilitate criminal activity or present a substantial threat to national security or the security, discipline, or good order of the institution.  This initial determination is to be made by the USMS/BOP/DF and, if the USMS/BOP/DF determines that the FBI's and/or CIA's expertise is required, the book(s) will be forwarded to the FBI and/or CIA for review.  In conducting its analysis, the FBI and/or CIA will determine whether access to the book by you would pose a substantial threat to national security.

    b.   In order to avoid passing messages/information from inmate to inmate, you shall be allowed to share institutionally purchased books with other SAM inmates only after each book is physically screened by staff to ensure that messages cannot be passed between the SAM inmates.  Books individually purchased by you may not be shared with any other inmate.

10.  **Transfer of Custody:**  In the event that you are transferred to or from the custody of the USMS, BOP, or any other DF, the SAM provisions authorized for you will continue in effect, without need for any additional DOJ authorization.

**CONCLUSION**

    The SAM set forth herein, especially as they relate to attorney/client-privileged communications and nonlegal contacts, are reasonably necessary to prevent you from revealing classified information.  Moreover, these measures are the least restrictive that can be tolerated in light of the ability for you to divulge such classified information.

    With respect to telephone privileges, the SAM are reasonably necessary because of the high probability of calls to others in which classified information may be disclosed.

    The SAM, with respect to mail privileges, is reasonably necessary to prevent you from receiving or passing along critically times messages.  Accordingly, your interest in

**"Sensitive But Unclassified"**

Approved for Release 8/11/2015

Notification of Extension of Special Administrative Measures
Harold Nicholson, Reg. No. 49535-083
June 26, 2015
Page 17

the timely receipt and/or submission of mail, with the possible danger the contents of the mail may post to others, was weighed.  While it is recognized that eliminating your mail privileges entirely may be an excessive measure except in the most egregious of circumstances, it is believed that delaying mail delivery and allowing authorized personnel to examine a copy of the mail, is sufficient at this time to interrupt any communication of classified information.  Under this procedure, you can relate personal news to family members, even if delayed, but you may find it difficult or unwise to pass along restricted information.

The SAM's prohibition of contact with the media is reasonably necessary.  Communication with the media could pose a substantial risk to disclosure of classified information.  Based upon your past behavior, it is believed that it would be unwise to wait until after you attempt to disclose classified information to impose such media restrictions.

The SAM's limitations on access to newspapers, publications, television, and radio are reasonably necessary to prevent you from receiving and transmitting classified information or information coded in a potentially undetectable manner.  Such messages may be placed in advertisements or communicated through other means, such as the television and/or radio.  While it is recognized that eliminating your access to such media may be an excessive measure except in the most egregious of circumstances, it is believed that limiting and/or delaying such access may interrupt communication patterns you may develop with the outside world, and ensure that the media is not used to communicate information which threatens the national security.

These conditions are imposed by the USMS/BOP/DF at the request of the Attorney General, through his designated agent, the Assistant Attorney General.

Received: June 25, 2015
     (17 pages)

_____
Harold Nicholson
Reg. No. 49535-083

**"Sensitive But Unclassified"**

Approved for Release 8/11/2015

*EXHIBIT D*



**U.S. Department of Justice**
Federal Bureau of Prisons

*Federal Correctional Complex*
☒ *Administrative Maximum Security Institution*
☐ *High Security Institution*
☐ *Medium Security Institution*
☐ *Minimum Security Institution*

*Florence, CO 81226*

September 26, 2012,

MEMORANDUM FOR  W. Heim, Supervisory Correctional Systems Specialist

FROM:              D. J. Krist, SIA

SUBJECT:           **Inmate Mail Rejection: NICHOLSON 49535-083**

The attached correspondence is submitted for rejection due to the following reasons:

1.          PUBLICATION/CORRESPONDENCE    WHICH    CONTAINS
            INFORMATION THAT MAY JEOPARDIZE THE SECURITY OF THE
            INSTITUTION AND THEREFORE POSES A THREAT :

2.          INMATE TO INMATE CORRESPONDENCE WHICH IS NOT
            APPROVED:

3.          INMATE TO INMATE VIA A THIRD PARTY:

4.          CONTAINS POSSIBLE CODES AND THEREFORE A SECURITY
            THREAT EXISTS:

5.          CONTAINS MAPS:

6.          CONTAINS DRAWINGS OR PHOTOS OF CELLS, REC. YARDS,
            PERIMETER FENCES, ETC. (SECURITY THREATS):

7.          FOREIGN LANGUAGE THAT CAN NOT BE TRANSLATED:

8.          **OTHER/COMMENTS: Attempting to relay information to a
            third party.**

Approved for Release 8/11/2015

Returned to me 28 Sep 2012

"EXHIBIT D"

1/3

Dear Mom & Dad,                                    19 SEP 2012

Sorry I missed you at my phonecall yesterday — I know you expected it the day before. Because of our "unique" prison and its "unique" population things sometimes don't go as planned here. Anyway, I had a good conversation with Rob and he brought me up to date with how all are doing at home. He assured me you both are fine and still full of fire and vinegar. ☺

I also learned that Skipper got scared straight and is now done playing like an old man and is back to his frisky self. I guess that visit to the Vet convinced him he was on thin ice and had better improve his outward disposition.

I just wrote to Rob that if Skipper gets too tired of walking Dad, you might consider bringing Kanokwan over to walk him. Once Skipper sees the competition he likely will again buckle down to his responsibilities. I also mentioned that Mom shouldn't look like she just got beaten up if Dad was going to get Kanokwan to walk him. People might talk. ☺

Speaking of Kanokwan, I also wrote

Approved for Release 8/11/2015

213

to Rob that it would mean a lot to me if both you and he would drop a hello to Kanokwan once a week (every other week for each of you) even if she hasn't replied. I know she was always so pleased when Mom would drop a line and when you guys sent gifts. As you know she refers to you as "Mom and Dad" and to Rob as her "brother" according to Thai custom for engaged couples. I just don't want her to think she's written off by our family just because I currently can't write to her. I still have my requests in. I think she doesn't always respond immediately because she thinks her English isn't always correct and may be a little embarassed to make mistakes in writing to you. With me she knew I was used to the way she wrote and the occasional Thai expression. Regardless, I know she's thrilled to get notes from you. Thanks so much.

Oh, yesterday I got your 7 Sep letter. Thanks so much. Rob told me he thought you'd gotten a couple letters from me last Saturday. I'm curious to know if my sketch of Tammie has arrived and what she

Approved for Release 8/11/2015

3/3

thinks of it.  As you see, in this packet
I've enclosed 2 more watercolors.  I'm kind
of happy with how my Casablanca watercolor
turned out.

Thanks to your neighbor for liking my
art.  I hope to get better as time
progresses

Well, I love you both and I love
our family.  I want you to know
I'm just fine.  More soon.


Love always,

Approved for Release 8/11/2015

Returned to
me on 14 MAY 2013          "EXHIBIT E"          1/3
LETTER #15

Dear Mom & Dad,                    1 APR 2013

    I received your letters #1 and 2 today. The
#1 letter was mailed on 13 March. The last letter
I received before that was mailed on 27 Feb, so
I think there is a letter missing, since you write
every week. They told me, however, that all my
incoming letters were cleared, so either there is
no missing letter, it fell behind a desk or
they tossed it. Either way, at least I got
2 letters, so I'm happy.
    I'm enclosing another photo. The CLOs told
me I look like I belong on the program
"Yukon Men." ☺ Today they pulled an April Fools
joke on me and told me I'd been moved back
to Phase 1 (showers 3 times a week instead of every
day) and that they'd been told to move me to
the Tunnel (a separated area — but actually not
much different from where I am). Then they
told me "April Fools!" The lady bubble officer
called me on my cell intercom and said she
thought her colleagues were "just mean." We
had a good laugh. Actually the staff here
are heads above most of those I've encountered
in other joints.
    I guess they like my work because they're
keeping me as orderly for another 3 months.
Something to do.

Approved for Release 8/11/2015

2/3

I think Kanokwan and Len would be surprised to see this photo and how Colorado has reversed the ageing process (except the eyes probably give me away). ☺ By the by, did Kanokwan like the sketch I did of her and me together? I'm thinking of trying another sketch.

Well, I'm fine. I've spent some spiritual meditation time recently that's got me back on track. I need reassurance from time to time that I really do have a purpose in God's plan. Sometimes I've felt like things were finally working together for this, but then I'd get whacked really hard and I naturally would question whether I was connected spiritually or not. Sometimes we need to travel down a road and look back to see what the purpose was in doing so. I don't get all the answers I seek, but I get enough to keep me going back for more and I get the reassurance I need to expect what I have believed is coming. I also know that when God moves, He moves suddenly. So, I wait and while I wait, I expect something from God that will border on miraculous. Sometimes we just

Approved for Release 8/11/2015

3/3

need to make ourselves available. So, I do.
Len sent me a couple Christian-themed books for Easter. I am reading from 6 separate books every day trying to keep up with my various areas of interest. I read shakespere, the Bible, a religious study on Islam, a book from Psychology (for credit) on Transformative Meditation, and 2 novels. I always end my day by reading a light-hearted book. Speaking of that, did you let Len know I like P.G. Wodehouse books? They are light-hearted and I appreciate British humor. So far Len hasn't sent me any books by him. I certainly appreciate all the books he does send and wouldn't think of asking for more, but if he still wants to send me more, P.G. Wodehouse (and Martha Grimes) are good pre-bedtime reading. :)

Well, I'm happy that our family is doing well. Jeremi hasn't written to anyone since he got to Korea. From the news I think he must be very busy. Probably regular alerts and long hours. You know how that is.

OK - Love you! Please stay well and happy.

Approved ~~for public release~~ 2015 TO CONTACT REQUEST BY HAROLD J. NICHOLSON

EXHIBIT F #49535-083

Page 1/6

I HEREBY PRESENT DETAILS ON MY FIANCEE KANOKWAN LEHLIEM, THE HISTORY OF MY RELATIONSHIP WITH HER AND RELATED DETAILS, UNTIL IMPOSITION OF SAMs. I HAD BEEN IN REGULAR MAIL AND PHONE CONTACT WITH HER (ALL MONITORED BY BOP AND C/A) WITH NO SECURITY CONCERNS. SHE HAD ALSO BEEN ON MY APPROVED VISITORS LIST. THIS (MAIL) CONTACT HAD BEEN FROM THE TIME OF MY ARREST IN NOV 96 UNTIL JUL 2011, (ALTHOUGH I WAS W/O PHONE CONTACT FROM DEC 2008).

- KANOKWAN ((LEHLIEM)) WAS BORN 23 NOV 1965 IN ~~PRACHINBURI~~ ARANYAPRATHET, THAILAND. SHE IS A THAI CITIZEN. (COPIES OF HER PASSPORT AND U.S. VISA PREVIOUSLY PROVIDED.)

- KANOKWAN'S FATHER, NOW DECEASED, WAS A THAI ARMY NCO. HER MOTHER IS A HOMEMAKER RESIDING IN ARANYAPRATHET, SAKAEW PROVINCE, THAILAND. HER ADDRESS IS THE SAME AS KANOKWAN'S, TO WIT:

214 MOO 1, BANMAISAITHONG ARANYAPRATHET, SAKAEW 27120 THAILAND

PAGE 1 OF 6

Approved for Release 8/11/2015

- NAMES OF PARENTS:
   KERD ((LEHLIEM)) BORN 19 MAR. 1929
   KIMBANG ((PHANOMSING)) BORN 28 JUL 1937

- HISTORY OF MY RELATIONSHIP WITH KANOKWAN:
   - I WAS FIRST INTRODUCED TO KANOKWAN IN 1986 BY HER BROTHER, CHUMPHOL ((LEHLIEM)).

   - I WAS TRANSFERRED IN 1987.

PAGE 2 OF 6

Approved for Release 8/11/2015

Page 3/6

– AFTER MY MARRIAGE COLLAPSED,
I AND MY CHILDREN MOVED TO KUALA
LUMPUR, MALAYSIA WHERE I WORKED OUT
OF THE U.S. EMBASSY. THIS WAS
1992 – 1994.   WHILE THERE I RESUMED
COMMUNICATION WITH KANOKWAN.

Approved for Release 8/11/2015

Page 4/6

— THIS COMMUNICATION STOPPED WHEN I WAS DATING AND, LATER, ENGAGED TO A MALAYSIAN LADY.   WHEN THIS ENGAGEMENT ENDED IN 1995, I AGAIN CONTACTED KANOKWAN AND ARRANGED TO MEET WITH HER.   WE WERE ENGAGED SHORTLY AFTER.

— IN JULY 1996 I BROUGHT KANOKWAN TO THE U.S. TO MEET MY FAMILY. I FURTHER SUBMITTED A REQUEST TO THE CIA FOR PERMISSION TO MARRY HER.

— IN NOVEMBER 1996 I WAS ARRESTED AND OUR MARRIAGE PLANS WERE PUT ON HOLD.   ALTHOUGH I ENCOURAGED KANOKWAN TO MOVE ON AND NOT WAIT FOR ME, SHE REPLIED THAT THERE WAS NO ONE SHE WOULD RATHER MARRY AND WOULD WAIT AS LONG AS IT TOOK.

— UNTIL MY ARREST, KANOKWAN HAD NO IDEA I HAD BEEN ASSISTING THE RUSSIAN GOVERNMENT.

Approved for Release 8/11/2015

Page 5/6

– AFTER MY SENTENCING IN 1997 I WAS MOVED TO THE FEDERAL CORRECTIONAL INSTITUTION IN SHERIDAN, OREGON. AS PART OF A PRELIMINARY AGREEMENT I HAD TO SIGN TO BE PERMITTED INTO THE GENERAL POPULATION, ALL MY MAIL WAS SENT TO CIA FOR REVIEW BEFORE IT WAS RELEASED AND ALL MY PHONECALLS WERE ROUTED THROUGH THE CIA FOR MONITORING (IN ADDITION TO THE STANDARD BOP MONITORING). I WAS, IN THIS WAY, ABLE TO BOTH WRITE TO AND PHONE KANOKWAN. THIS WAS ACCOMPLISHED WITHOUT INCIDENT OR SECURITY BREACH OF ANY KIND. ALTHOUGH MY PHONE PRIVILEGES WERE REMOVED IN DECEMBER 2008 WHEN I WAS CHARGED ANEW, MY MAIL PRIVILEGES CONTINUED UNTIL SPECIAL ADMINISTRATIVE MEASURES (SAM) WERE IMPOSED ON 1 JULY 2011.

– UNTIL MY TRANSFER FROM FCI SHERIDAN IN 2011, KANOKWAN WAS ALSO ON MY APPROVED VISITATION LIST, ALTHOUGH WE WERE UNABLE TO ARRANGE A VISIT DUE TO HER WORK AND FINANCIAL LIMITATIONS.

PAGE 5 OF 6

Approved for Release 8/11/2015

Page 6/6

- FOLLOWING MY ARREST IN NOV 96, KANOKWAN COMPLETED HER BACHELOR'S DEGREE AND WORKED AS OFFICE MANAGER FOR K.C. LOGISTICS CO. IN BANGKOK, THEN FOR A SINGAPORE-BASED CASINO CONGLOMERATE IN THEIR OPERATIONS. SHE CURRENTLY WORKS AS OFFICE MANAGER AND FLOOR SUPERVISOR FOR THIS COMPANY IN POIPET, CAMBODIA WHICH IS ADJACENT TO ARANYAPRATHET.

- KANOKWAN HAS NEVER TRAVELED TO RUSSIA NOR HAD ANY CONTACT WITH THE RUSSIAN GOVERN-MENT. SHE KNEW NOTHING OF MY CONTACTS WITH RUSSIANS ALTHOUGH SHE WAS AWARE OF MY CIA AFFILIATION.

- IT IS THAI CUSTOM TO CONSIDER AN ENGAGED COUPLE TO BE PART OF EACH OTHER'S FAMILY. KANOKWAN AND I HAVE CONSIDERED OURSELVES SO SINCE OUR ENGAGEMENT OVER 18 YEARS AGO. WE WOULD BE MARRIED NOW IF WE WERE ABLE.

- THERE IS NO REASON WHY MY MONITORED CONTACT WITH KANOKWAN WOULD BE A THREAT TO NATIONAL SECURITY OR NATIONAL PENAL INTERESTS. FURTHER, HER MOTHER HAS BEEN DIAGNOSED WITH CANCER AND CONTACT WITH ME WOULD BE OF SOME COMFORT TO HER AND HUMANE.

HAROLD J. NICHELSON
1 JULY 2015     PAGE 6 OF 6

Approved for Release 8/11/2015

*EXHIBIT G*

NICHOLSON, HAROLD J

*PAGE 1/3*

## INMATE COPY

**VISITING LIST FOR INMATE: NICHOLSON, HAROLD J**
**REGISTER NUMBER: 49535-083**
**UNIT: UNIT 4**

| | | |
|---|---|---|
| ADAMSON, BRUCE<br>1403 PARK AVE.NE<br>SALEM , OREGON 97301<br>UNITED STATES OF AMERICA | Inmate Visitor<br>PHONE: | COUSIN<br>APPROVED: 06-06-1999 08:29 |
| ADAMSON, HAROLD<br>5473 commercial st. SE #19<br>SALEM , OREGON 97306<br>UNITED STATES OF AMERICA | Inmate Visitor<br>PHONE: | UNCLE<br>APPROVED: 06-06-1999 08:29 |
| ANDRE, BRETT<br>38203 SE PORTER RD.<br>ESTRADA , OREGON 97023<br>UNITED STATES OF AMERICA | Inmate Visitor<br>PHONE: | COUSIN<br>APPROVED: 06-06-1999 08:29 |
| ANDRE, JANYCE<br>38203 SE PORTER RD<br>ESTACADA , OREGON 97023<br>UNITED STATES OF AMERICA | Inmate Visitor<br>PHONE: | COUSIN<br>APPROVED: 06-06-1999 08:29 |
| ANDRE, LARRY<br>38203 SE PORTER RD.<br>ESTACADA , OREGON 97023<br>UNITED STATES OF AMERICA | Inmate Visitor<br>PHONE: | FRIEND<br>APPROVED: 06-06-1999 08:29 |
| BEYSTRUM, LEONARD<br>11692 CAMEL CREEK RD. #106<br>SAN DIEGO , CALIFORNIA 92130<br>UNITED STATES OF AMERICA | Inmate Visitor<br>PHONE: | FRIEND<br>APPROVED: 06-06-1999 08:29 |
| CODY, MARY JANE<br>68914 E.TAWNEY LANE<br>WELCHES , OREGON 97023<br>UNITED STATES OF AMERICA | Inmate Visitor<br>PHONE: 503-622-6064 | FRIEND<br>APPROVED: 11-02-2001 11:51 |
| EICHNER, MARJORIE<br>38644 SE COUPLAND RD<br>ESTACADA , OREGON 97023<br>UNITED STATES OF AMERICA | Inmate Visitor<br>PHONE: | COUSIN<br>APPROVED: 06-06-1999 08:29 |
| FREDRICY, RICHARD ARTHUR<br>20376 BALD MOUNTAIN COURT<br>MONUMENT , COLORADO 80132<br>UNITED STATES OF AMERICA | Inmate Visitor<br>PHONE: 719-481-8880 | FRIEND<br>APPROVED: 11-29-2005 19:17 |

SHERIDAN FCI                     Page 1 of 3                     05-17-2007 15:00



NICHOLSON, HAROLD J
# 49535-083
PAGE 2/3

| | | |
|---|---|---|
| HOGG, MAXINE<br>2301 BARRINGTON ST<br>BAKERSFIELD , CALIFORNIA<br>UNITED STATES OF AMERICA | Inmate Visitor<br>PHONE: | AUNT<br>APPROVED: 07-15-1999 16:25 |
| LANGER, LYNN<br>11692 CARMEL CR. RD. #106<br>SAN DIEGO , CALIFORNIA 92130<br>UNITED STATES OF AMERICA | Inmate Visitor<br>PHONE: 858-947-5369 | FRIEND<br>APPROVED: 05-15-2007 13:08 |
| LEHLIEM, KANOKWAN<br>214 MOO.1 Banmaisaithong Aranyaprathet<br>Sakaew<br>THAILAND | Inmate Visitor<br>PHONE: | SIGNIFICANT OTHER<br>APPROVED: 09-14-2006 14:22 |
| NIBLER, SANDRA EILEEN<br>8610 PARKER ROAD<br>INDEPENDENCE , OREGON 97351<br>UNITED STATES OF AMERICA | Inmate Visitor<br>PHONE: 503-838-4409 | COUSIN<br>APPROVED: 05-15-2006 08:29 |
| NICHOLSON, ASTRALENA<br>2354 SW SCHMIDT #101<br>BEAVERTON , OREGON 97006<br>UNITED STATES OF AMERICA | Inmate Visitor<br>PHONE: | ADULT DAUGHTER<br>APPROVED: 06-06-1999 08:29 |
| NICHOLSON, BEATRICE<br>1699 N TERRY SP 161<br>EUGENE , OREGON 97402<br>UNITED STATES OF AMERICA | Inmate Visitor<br>PHONE: | MOTHER<br>APPROVED: 06-06-1999 08:29 |
| NICHOLSON, JEREMIAH<br>16 B GARDENIA CIRCLE<br>SPRINGLAKE , NORTH CAROLINA 28390<br>UNITED STATES OF AMERICA | Inmate Visitor<br>PHONE: | ADULT SON<br>APPROVED: 06-06-1999 08:29 |
| NICHOLSON, MARVIN<br>1699 N TERRY SP 161<br>EUGENE , OREGON 97402<br>UNITED STATES OF AMERICA | Inmate Visitor<br>PHONE: | FATHER<br>APPROVED: 06-06-1999 08:29 |
| NICHOLSON, NATHANIEL<br>223 CONESTA WAY<br>EUGENE , OREGON 97401<br>UNITED STATES OF AMERICA | Inmate Visitor<br>PHONE: | ADULT SON<br>APPROVED: 06-06-1999 08:29 |
| NICHOLSON, ROBERT<br>1699 N Terry St<br>Eugene , OREGON 97402<br>UNITED STATES OF AMERICA | Inmate Visitor<br>PHONE: | BROTHER<br>APPROVED: 09-29-2006 10:06 |

Approved for Release 8/11/2015

**INMATE VISIT/TOUR LIST**

NICHOLSON, HAROLD J
PAGE 3/3

| Visitor | | Relationship |
|---|---|---|
| **NORTON, KERRY**<br>1033 CONCORD WAY<br>PROSSER , WASHINGTON  99350<br>UNITED STATES OF AMERICA | Inmate Visitor<br>PHONE: | FRIEND<br>APPROVED: 06-06-1999 08:29 |
| **NORTON, VIRGINIA**<br>1033 CONCORD WAY<br>PROSSER , WASHINGTON  99350<br>UNITED STATES OF AMERICA | Inmate Visitor<br>PHONE: | FRIEND<br>APPROVED: 06-06-1999 08:29 |
| **PIATT, MICHAEL HARTLEY**<br>38 NORTH WALES RD.<br>HOLLAND , MASSACHUSETTS  01521<br>UNITED STATES OF AMERICA | Inmate Visitor<br>PHONE: 413-245-3403 | FRIEND<br>APPROVED: 10-19-2003 07:51 |
| **ROGERS, DANIELLE**<br>3831 dove lane<br>eugene , OREGON  97402<br>UNITED STATES OF AMERICA | Inmate Visitor<br>PHONE: 541-359-8664 | NIECE<br>APPROVED: 02-26-2007 14:29 |
| **ROGERS, DESTINY**<br>90764 LINK RD<br>EUGENE , OREGON<br>UNITED STATES OF AMERICA | Inmate Visitor<br>PHONE: | NIECE<br>APPROVED: 06-26-2000 16:27 |
| **ROGERS, DUSTIN ALBERT**<br>1699 N TERRY<br>EUGENE , OREGON  97402<br>UNITED STATES OF AMERICA | Inmate Visitor<br>PHONE: 541-607-1696 | NEPHEW<br>APPROVED: 10-19-2003 07:50 |
| **ROGERS, TAMIE**<br>1699 N TERRY ST<br>EUGENE , OREGON  97402<br>UNITED STATES OF AMERICA | Inmate Visitor<br>PHONE: | SISTER<br>APPROVED: 06-06-1999 08:29 |
| **STARR, MARIAH ELIZABET**<br>18370 SW BOONES FERRY ROAD<br>DURHAM , OREGON  97224<br>UNITED STATES OF AMERICA | Inmate Visitor<br>PHONE: 503-484-5466 | COUSIN<br>APPROVED: 07-04-2004 07:49 |

**TOTAL VISITORS: 27**

Approved for Release 8/11/2015 EXH·BiT H



**U.S. Department of Justice**
Federal Bureau of Prisons

*United States Penitentiary –*
*Administrative Maximum*

---

Florence, Colorado 81226

March 24, 2015

MEMORANDUM FOR:  NICHOLSON, HAROLD J
Reg. No. 49535-083

FROM:  T. Gomez, Unit Manager

SUBJECT:  Renewal of Special Administrative Measures

The Special Administrative Measures (SAM) implemented in your case, are set for expiration/renewal on or about June 20, 2015. Please provide any comments and/or recommendations concerning your SAM's possible renewal. You are not limited to the section provided. You may attach continuation pages and documentation you want considered. Your input will be reviewed and considered in determining whether your SAM should be renewed and/or modified. Please provide your input on or before March 31, 2015.

(PAGE 1 OF 2)

Inmate Statement: IN PREVIOUS YEARS I'VE DETAILED THE REASONS WHY SAMS ON ME ARE UNNECESSARY. I UNDERSTAND THAT AGAIN DETAILING THEM IS ESSENTIALLY AN EXERCISE IN FUTILITY AS THE DECISION WHETHER TO RENEW THEM OR NOT IS COMPLETELY AT THE DISCRETION OF ONE OR A SMALL GROUP OF CIA EMPLOYEES.

FOR THAT REASON, THIS YEAR I SIMPLY REQUEST ONE MINOR MODIFICATION TO MY SAMS, TO WIT THAT I BE PERMITTED TO SEND A SINGLE PRE-APPROVED LETTER TO MY FIANCEE KANYKWAN LEHLIEM EACH MONTH JUST TO ASSURE HER

(PLEASE SEE CONTINUATION PAGE)

I AM ALIVE, TO TELL HER ABOUT OUR FAMILY, AND TO ASK AFTER HER AND EXPRESS MY LOVE. I WOULD ALSO LIKE APPROVAL TO RECEIVE ONE PRE-APPROVED LETTER FROM HER EACH MONTH IN RETURN.

I HAVE PREVIOUSLY DETAILED FOR THE CIA AND GOVERNMENT AT LARGE THE COMPLETE BIO ON MY FIANCÉE AND THE HISTORY OF OUR RELATIONSHIP. AS THE CIA IS WELL AWARE, MS. LEHLIEM HAS ONLY EVER WORKED FOR ONE GOVERNMENT — THE U.S. GOVERNMENT. SHE IS NOT NOR HAS EVER BEEN AN AGENT OF A FOREIGN GOVERNMENT, WAS NEVER CONSIDERED A CO-CONSPIRATOR WITH ME AND IS NOT MENTIONED IN MY SAMS OR IN ANY COURT PROCEEDINGS. SHE CONTINUES TO LIVE AND WORK FROM HER HOME IN UP-COUNTRY THAILAND. HER PAST WORK FOR THE U.S. GOVERNMENT IN AN OCCASIONALLY DANGEROUS ENVIRONMENT SHOULD WEIGH IN HER FAVOR IN GRANTING THIS VERY LIMITED CONTACT. SHE HAS SPENT MOST OF HER ADULT LIFE WAITING FOR ME (SHE TURNS 50 THIS YEAR) AND SHOULD NOT BE PUNISHED FURTHER BY PREVENTING HER FROM THIS SMALL THREAD OF CONTACT WITH ME.

THAT'S ALL I ASK THIS YEAR. THANK YOU.

1   were taken by the United States Government.  It was my

2   children's home, my children's family car, my children's

3   possessions, and their personal savings accounts that were also

4   seized by the United States Government, in effort to punish me.

5           For -- at that time, on that day, my children were

6   told to pack one bag each.  They were then taken to the

7   airport, with their pet cats, placed on an airplane, and flown

8   from their home in Virginia to Oregon; a place where they had

9   only visited their relatives.

10          My oldest son was forced to leave college and to get a

11  job, in effort to help support his younger brother and sister.

12          For over a decade, I sat, as if in amber, watching

13  from the federal prison, while my children struggled to make

14  ends meet.  They did a heroic job.

15          After 9-11 and the terrorists attacked in 2001, both

16  of my boys entered the military on their own, but with my

17  blessing.

18          My daughter went on to get a college degree, and set

19  out to pursue a career on her own.

20          For the last 766 days, your Honor, I have been in

21  solitary confinement.  I have been held in a stark cement cell

22  for 24 hours a day.  I have been separated from my family.

23  Other than letters, I have had no contact with anyone but my

24  legal team and prison officials.

25          THE COURT REPORTER:  I'm sorry?

1              THE COURT:  By his legal team.

2              THE DEFENDANT:  During this time I have concluded that

3      my children never really needed the extent of help that I

4      thought they needed.

5              My children, each one of them, are wonderful, good

6      caring, smart, and capable people.

7              The truth is, your Honor, it was not just their need

8      for assistance that caused me to suggest the course of action

9      that I did.  It was my pride.  It was also the illusion that I

10     was somehow indispensable to my children's survival.

11             Your Honor, in solitude, illusions dissolve.  It was

12     in my solitude of solitary confinement that I realized that all

13     my children ever really needed from me was my love.

14             Your Honor, in regard to the acts that were committed,

15     I want to -- also like to add that I sought help for my

16     children only later, when they were undergoing difficult times.

17     Two of my children were facing student loan payments they

18     couldn't make.  They had rents that they were struggling to

19     pay.  And it was in desperation that, after all of my prison

20     savings had been expended, that they might be helped by only

21     one source, and the source I could think of at the time was the

22     Russian Federation.

23             Now I recognize that it was because of my previous

24     assistance to them that they were willing to help my children

25     in their time of need.  However, I would also like to add that

6

1    the Russians owed me nothing.  And <u>insofar as</u> their efforts

2    were truly to help my children, I regret the embarrassment that

3    this has caused them <u>as well</u>.

4              I would like to say, further, that I -- well, I would

5    like to ask my children to forgive me.

6              When I was initially arrested, I could have never

7    imagined that I would fail them again.  And I will endeavor not

8    to do so, once more.

9              I would like to say, your Honor, in regard to my young

10   son, that if he harbors any feeling of failure in this regard,

11   to let those feelings go.  His efforts in all of this were

12   completely selfless.  And they were designed only to help his

13   family in their time of need.

14             I love him dearly.  I could not be more proud of him.

15   He has never let me down, and he has never failed his family.

16   Any failure has been mine alone.

17             That's what I would like to say, your Honor.  Thank

18   you.

19             (Conclusion of excerpt.)

20

21                         -0-

22

23

24

25

7

--oOo--

I certify, by signing below, that the foregoing is a correct transcript of the oral proceedings had in the above-entitled matter this 18th day of January, 2011.  A transcript without an original signature or conformed signature is not certified.  I further certify that the transcript fees and format comply with those prescribed by the Court and the Judicial Conference of the United States.

/S/ Amanda M. LeGore
_____

AMANDA M. LeGORE, RDR, CRR, FCRR, CE

FREE COPY

EXHIBIT K

ATTACHMENT AS EXHIBIT TO ~~ADMIN REMEDY FILING~~

~~19 MAR 2014   STATEMENT ON WHY SAMS SHOULD~~

~~NOT BE RENEWED.~~  (SUBMITTED TO MY UNIT TEAM

ON 20 MAR 2014)

STATEMENT ON WHY SAMS SHOULD

NAME: HAROLD J. NICHOLSON          NOT BE RENEWED

     # 49535-083

THERE ARE SEVERAL KEY REASONS WHY THE SAMS ON

ME ARE NOT NEEDED.  THE MOST SIGNIFICANT REASON IS THAT

THE MOTIVATION I HAD FOR TAKING THE ACTIONS I DID THAT

~~RESULTED IN MY IMPRISONMENT AND SAMS, I NO LONGER~~

HAVE.  MY CHILDREN ARE DOING FINE NOW AND DO NOT

NEED MY HELP TO MANAGE.

REGARDING THOSE PARTS OF MY SAM RELATED TO

PHYSICAL SECURITY, ETC., I SIMPLY POINT OUT THAT

I HAD NO VIOLENCE IN MY CRIME NOR ANY VIOLENCE

IN MY NEARLY 18 YEARS OF IMPRISONMENT, INCLUDING

14 YEARS IN GENERAL POPULATION.  I AM NOT A

~~THREAT TO ANYONE, STAFF OR PRISONERS INCLUDED.~~

( PLS SEE CONTINUATION PAGE )

CONTINUATION OF STATEMENT RE SAMS IN RE HAROLD J. NICHOLSON, 49535-083, 19 MAR 2014:

MY RECORD ATTESTS TO THE FACT THAT I HAVE CONTRIBUTED, THROUGH MY PAST LEADERSHIP ROLE IN THE CHRISTIAN CHURCH AT SHERIDAN FCI, TO KEEPING PEACE BETWEEN INDIVIDUALS AND GROUPS WHEN CONFLICTS AROSE.

INSOFAR AS MY COMMUNICATIONS ARE CONCERNED, THE CIA HAS REVIEWED ALL MY INCOMING AND OUTGOING MAIL AND PHONECALLS THROUGHOUT MY ENTIRE PRISON TIME JUST AS THEY DO NOW UNDER SAMS. THERE HAVE BEEN NO INCIDENTS IN WHICH ANY CLASSIFIED INFORMATION HARMFUL TO NATIONAL SECURITY WERE COMMUNICATED DURING THIS ENTIRE TIME. CERTAINLY THIS IS EVIDENCE THAT SAMS ARE UNNECESSARY TO MONITOR MY MAIL AND PHONECALLS.

I ALSO WOULD POINT OUT THAT I HAVEN'T HAD ACCESS TO ANY CLASSIFIED INFORMATION IN NEARLY 18 YEARS AND THAT ANY INFORMA- TION I MIGHT STILL RETAIN AFTER THIS LENGTH OF TIME COULD HARDLY BE A THREAT TO NATIONAL SECURITY EVEN IF I WAS MOTIVATED TO REVEAL SUCH, WHICH I AM NOT.

THROUGHOUT MY PRISON EXPERIENCE I HAVE CONTINUED TO ACTIVELY SEEK WAYS OF SELF-IMPROVEMENT. I PARTICIPATE IN EDUCATION,

CONTINUATION OF STATEMENT RE SAMS IN RE HAROLD J. NICHOLSON, 49535-083, 19 MAR 2014:

RECREATION AND PSYCHOLOGY PROGRAMS THAT ARE AVAILABLE AND, WHEN RELIGIOUS OPPORTUNITIES WERE AVAILABLE TO ME, I SERVED IN A LEADERSHIP ROLE WITH OUR CHRISTIAN CHURCH. I WORKED IN UNICOR FOR OVER TEN YEARS. ALTHOUGH THERE IS NO OPPORTUNITY FOR UNICOR EMPLOYMENT UNDER SAMS, I HAVE SERVED AS A UNIT ORDERLY ON A ROTATING BASIS EVEN HERE AT ADX.

IN SUM, I AM NOT A THREAT TO NATIONAL SECURITY OR ANY INDIVIDUAL. RETURNING TO GENERAL POPULATION WOULD PERMIT ME TO AGAIN BE A POSITIVE INFLUENCE AMONG OTHER PRISONERS WHILE PREPARING MYSELF TO REENTER SOCIETY AT THE END OF MY PRISON TIME.

THANK YOU.

HAROLD J. NICHOLSON
19 MAR 2014



TODAY™
12.10.14
A GANNETT COMPANY

EXHIBIT L 1/2   "USA TODAY"
(Front Page)

## NEWS ANALYSIS

# Time and again, CIA stretches trust

**And each time, agency says inquiry will endanger lives**

Ray Locker
USA TODAY

Not for the first time and perhaps not for the last, a Senate committee report has declared the CIA a rogue agency that oversteps its bounds, manages its work poorly and then lies about it when confronted.

The history of intelligence oversight has been one of evasion, confrontation and obfuscation. When the agency's veil of secrecy is pierced, the revelations are usually sensational.

As it was on Tuesday, when the Senate Intelligence Committee released its long-await-

terrorists after the 9/11 attacks. Since 2001, the CIA has blocked attempts to oversee its activities and misled Congress and the White House about the interrogations, said Sen. Dianne Feinstein, the California Democrat who leads the Intelligence Committee. The agency also made it difficult for the committee to carry out its own investigation that started in 2009, she added.

It felt like history repeating itself.

In 1976, a panel led by Sen. Frank Church, an Idaho Democrat, released a report on the agency's Cold War excesses that included violating its charter by spying on Americans in the U.S., planning the assassinations of foreign leaders and testing hallucinogenic drugs on unsuspecting subjects, includ-

EXHIBIT L 2/2

UNCLASSIFIED

## NEWS ANALYSIS

# CIA shows it can't be left to its own devices

▶ CONTINUED FROM 1A

ing one who jumped aboard in a move to head off a further bias charge against the agency, that has done the most to propel Americans' pleas for civil rights after 9/11 attacks.

The objections are unde-sustainable given the furor of the reports that writes about how agency operatives worked to virtually everyone, including President George W. Bush.

Past and current CIA officials object to the report, calling it biased and in-correct.

"No one should blindly accept the Com-mittee's assertions without a careful read-ing of the rebuttals," former CIA director George Tenet said in a statement published Tuesday to a website run by former agency officials. He called the report "biased, inaccurate, and destructive."

In a column in *The Wall Street Journal*, Tenet was joined by for-mer CIA directors Porter Goss and Michael Hayden, along with three former deputy directors, who said the interrogation pro-gram was "invaluable" in stop-ping further terrorist attacks. They said the report was a "one-sided study marred by errors of

truth, a poorly done and partisan attack on the agency that has done the most to protect America after 9/11 attacks."

The Intelligence Committee, which was created after Church's investigations, con-cluded Tuesday the agency lied to virtually everyone, including President George W. Bush.

report was a Democratic report with hunt, the 2008 Republican nominee for president, Arizona Sen. John McCain, fol-lowed Feinstein on the Senate floor to condemn the agency's use of torture.

Intelligence operatives work countless hours in some of the world's most inhospitable places to keep Americans safe. Their greatest successes often go un-noticed or unspoken for years, if not forever. Their sacrifices should never be forgotten; their victories should be appreciated, even if the country never knows what they are.

2010 GETTY IMAGES
George Tenet

don't-down, counter-rabbit holes. The result was not an intelligence, but an intelligence failure.

As for the claims the

me in the decade, particularly after it was shown there were no weapons of mass destruction in Iraq, the pretext for the 2003 U.S. invasion. The battles over that intelligence spanned most of the Bush administration and have caused groups on Obama.

In the 1970s, the Church Committee that found the same shadowed agency failures and excesses — a decade later, with the Iran government showed how the CIA supplied a rebel army in Nicaragua and traded weapons for hostages with the Iranian government backing terrorist groups in the Middle East. Back then, the agency said the investigation would endanger American lives.

The battle against terrorism and other threats to the United States will always be fought in the gray areas. Those who fight those battles believe they need to use every weapon at their dis-posal. They cite their experience and the fear that innocents may die as reasons they should be left alone to do what they do best.

"Those at the CIA "deserve a lot of praise," former vice presi-dent Dick Cheney told *The New York Times*. "As far as I'm con-cerned, they ought to be deco-rated, not criticized."

9/11, these public servants have worked tirelessly to devastate core al Qaeda, deliver justice to Osama Bin Laden, disrupt ter-rorist operations and thwart on-coming attacks," President Obama said in a statement Tuesday. "Our intelligence professionals are patriots, and we are safer be-cause of their heroic service and sacrifices."

But all intelligence policies and military groups require over-sight. Left to their own devices, history shows time and time again they can stray into violating basic human rights.

"Our enemies act without conscience. We must not," McCain said that day. "We must reject the coer-cive summary makes clear that acting without conscience isn't necessary, it isn't even helpful in winning this strange and long war we're fighting. We should be grateful to have that truth affirmed."

"Our enemies act without conscience. We must not ... It isn't even helpful in winning this strange and long war."

Sen. John McCain, R-Ariz.,
a former POW in Vietnam

Just as abhorrent those who commit the offenses. Claim they are keeping us safe and therefore somehow exempt from scrutiny, they contend people will die if their methods are exposed or analyzed. That argument has been used whenever the intel-ligence community or military come under scrutiny.

The misuse of agency intelli-

COPY

(THIS REQUEST WAS AGAIN DENIED
BY THE CIA ON 6 FEB 2014 WITHOUT
EXPLANATION)

Tracking Number: _____

Inmate Name: HAROLD J. NICHOLSON

Inmate Register Number: 49535-083

Contact's Name: KANOKWAN LEHLIEM

Contact's Address: 214 MOO.1, BANMAISAITHONG
_____ ARANYAPRATHET, SAKAEW 27120
_____ THAILAND
_____

Contact's Telephone Number: 011-66-37-222-241

Relationship to Inmate: FIANCÉE

Contact's Date of Birth: 23 NOV 1965

Contact's Place of Birth: ARANYAPRATHET, THAILAND

Contact's Citizenship: THAI

If Contact is a US Citizen, must provide Social Security Number:

N/A

Additional information (i.e. Driver's License Number or Passport Number, etc.)

PASSPORT # U 284067

SEE ATTACHED (1 AND 2)
_____

Type of Contact:  Non-legal mail ☒    Telephone ☒    Visitation ☒

_____

FOLLOW-UP REQUEST SUBMITTED 2 JAN 2014
MOST RECENT REQUEST SUBMITTED 16 MAY 2013
             (PREVIOUS)
CC: FILE